UNITED STATES of America

v.

**Alfred Borton AVERELL, Jr., and Bernard Aguinaldo, also known as Bernardino Cariago Aguinaldo, Defendants.**

**No. 66 CR 197.**

United States District Court
E. D. New York.

Feb. 11, 1969.

Chief Asst. U. S. Atty., Brooklyn, N. Y., of counsel, for United States.

Jacob W. Heller, New York City, for defendant Averell.

Leo Gitlin, New York City, for defendant Aguinaldo.

JUDD, District Judge.

## OPINION AND FINDINGS ON MOTIONS TO SUPPRESS AND TO DISMISS INDICTMENT

Lengthy hearings have been held on motions by both defendants to suppress certain evidence and for other relief in advance of trial. Alfred Averell and Bernard Aguinaldo were indicted for interstate transportation of stolen wigs (18 U.S.C. §§ 2314 and 2) and for conspiring to commit the substantive offense (18 U.S.C. § 371).

The indictment charges that the wigs in question were part of a shipment from New Century, Ltd., Hong Kong, to Sylvester & Sons, Inc. in Cherry Hill, New Jersey, which was hijacked in Weehawken, New Jersey, while in transit from Kennedy Airport in New York to the Cherry Hill address; and that, after being returned from New Jersey to New York, the wigs were shipped by the defendants via Trans Caribbean Airlines to San Juan, Puerto Rico, with knowledge that they were stolen.

The issues originally raised by the motions to suppress may be grouped under four main headings:

(1) The Kennedy Airport inspections.

(2) The T.C.A. search warrant.

(3) The San Jorge search warrant.

(4) The Aguinaldo handcuffing and questioning.

In addition, motions to dismiss the indictment were made orally, on the basis of facts disclosed during the hearings concerning the government's release of most of the allegedly stolen wigs to Sylvester & Sons without notice to the defendants. The facts relating to this oral motion were not developed as fully as the facts concerning the motions to suppress. For the reasons set forth later in this

Joseph P. Hoey, U. S. Atty., Eastern Dist. of N. Y., by Vincent T. McCarthy,

opinion, the court does not deem it necessary to receive any further evidence concerning the release of the wigs.

Part of the attack on the two search warrants is that they are the fruit of an allegedly illegal inspection of wigs at the Kennedy Airport. The facts will be stated as found by this court, with discussion of the supporting evidence only when there is substantial conflict, and with a reference to the applicable law where appropriate.

### Preliminary—The Hijacking

The scenario begins in November, 1965, when New Century, Ltd. of Hong Kong was making large shipments of wigs to its American sales representative, Sylvester & Sons, Inc., in anticipation of an embargo on the shipment of Oriental wigs. Philip Chen, a graduate student at Polytechnic Institute in Brooklyn, was an officer and stockholder of Sylvester & Sons, Inc., a family corporation. His father, who controlled the Hong Kong firm and was also a stockholder in the New Jersey corporation, had sent notice that four shipments of wigs and wiglets had been forwarded from Hong Kong by air freight on about November 4, 1965.

The shipments, totaling 38 cartons, had been cleared through United States Customs by Penson & Co., customs brokers. On the basis of information from Penson & Co., Philip Chen obtained a certified check from his sister for $10,468 to pay the customs charges and brokerage commissions. Chen asked Averell, who was a principal of one of his New York City customers, Hollywood Secret Wigs, to rent a truck and meet him on November 18, 1965. They went together to Penson & Co., where they obtained delivery orders for the wigs in exchange for the check. (The check apparently covered another shipment beside those here in question, but that fact is not material.) The shipments covered by the delivery orders included 3,000 wigs and 1,800 wiglets, with a wholesale value of about $67,000, and a retail value in excess of $100,000.

After picking up 36 cartons (two had been lost in the airport) at several airlines, Chen and Averell set off for Cherry Hill, New Jersey. At Averell's suggestion, Chen stopped at a bar in Weehawken, where Averell made several 'phone calls. When they came out of the bar, after dark, and got into the truck, they were ordered out by two armed men, who blindfolded Chen and forced him into the back of an accompanying automobile, which they compelled Averell to drive. Averell and Chen were released, shoeless, later in the evening near Teterboro Airport, from where they reported the theft to the Weehawken police.

Later in 1965, Averell arranged a meeting in San Juan, Puerto Rico, with Lorenzo Cruz Rodriguez, a sewing supply salesman who represented American manufacturers in Puerto Rico. They discussed the possibilities of establishing a wig business in Puerto Rico, which Cruz investigated and reported could be lucrative. Cruz rented an apartment for Averell at 363 Calle San Jorge, Santurce, P. R., during January, 1966, and thereafter accompanied Averell to the San Juan Airport to pick up shipments of wigs. Averell, Cruz, and Averell's father-in-law, R. L. Lewis, set up a partnership called Don Rod Wigs, which operated out of the San Jorge apartment.

### (1) The Kennedy Airport Inspections

On the evening of Wednesday, February 16, 1966, Francis Romero, the night supervisor at the Trans Caribbean Airlines cargo agency (hereinafter referred to as T.C.A.) at John F. Kennedy Airport, reported to the cargo manager, Ernest Urrutia, by telephone to his home, that he had just received a shipment of four trunks under circumstances that seemed strange. The circumstances which were reported to Urrutia were that the persons who brought the shipment had sat in the parking lot until after Urrutia and the director of cargo sales and service, James McQuade, had left for the day; and that they had refused to give a New York address for the shipment, whereas cargo handlers had

been instructed to obtain a local address from all shippers. Urrutia asked that the shipment be set aside until the morning.

On the morning of Thursday, February 17, Urrutia and McQuade looked at the four trunks, which were consigned from "Rodriguez Sewing Supply, J. F. K. Airport, Jamaica, N. Y." to "Rodriguez Sewing Supply, P. O. Box 10353, Caparra Heights, San Juan." The airway bill described the contents as sewing machine parts. Reddish hair was visible below the cover at the side of one trunk; * McQuade observed also that the heft did not seem to be that of sewing machine parts, and thought that it was uncommon to ship machine parts in new steamer trunks.

### Opening the First Trunk

The Port of New York Authority Police and the Federal Bureau of Investigation (which maintains an office at Kennedy Airport) were then summoned by 'phone. T.C.A. maintained close relations with both agencies, because of the security requirements of the Airport, where pilferage and smuggling of contraband were extensive. High value air shipments, including wigs, were a major subject of theft. T.C.A.'s own losses by pilferage approximated $100,000 a year.

Both the F.B.I. and the P. N. Y. A. Police disclaimed authority to open the trunks, although one of the law enforcement officers mentioned that they might contain "a stiff." Urrutia called the T.C.A. attorney, and obtained his assurance that the T.C.A. tariffs gave the airline the right to open the trunks.

The tariff provision reads in full:

"Shipments shall be subject to inspection by the carrier."

A T.C.A. employee thereupon broke open the padlock on one trunk with a hammer blow, and pried open the center lock. When the trunk was opened, it was seen to be full of wigs, crammed in so

tightly that they overflowed the trunk when the pressure of the lid was released. On seeing the wigs pour out, McQuade exclaimed that they must be stolen.

While the physical opening of the trunk was done by a T.C.A. employee, it is clear that law enforcement officers were present. McQuade stated that, for the airline's protection, he wanted to have a law enforcement officer present at the opening. He stated that the freight rate for wigs was higher than for sewing machine parts, but that the rate difference, two cents a pound, or about $6.00 for the entire shipment, was not the determining factor, and that the suspicious circumstances might have led him to open the trunk even if the rates for both commodities were the same.

McQuade asked his staff to check prior shipments, and found manifests for three other shipments of "sewing machine parts" from Rodriguez Sewing Supply Co., with no New York City address, to Rodriguez Sewing Supply Co. at the same San Juan post office box.

McQuade let F.B.I. Agent Datz take five wigs for more detailed inspection. Datz reported that customs officials recognized them as wigs of Oriental origin, and that there had been a major theft of wigs a few months before. It was observed at the time that many of the wigs were without linings, labels, or tags.

McQuade gave orders to have the trunks set aside in safekeeping overnight, and asked the F.B.I. to bring a locksmith the next day, who could open the other trunks without damage to the locks.

### Opening the Remaining Trunks

On Friday morning, February 18, F.B.I. agents returned to the T.C.A. cargo office at Kennedy, with a detective from the New York City police. In the presence of the T.C.A. supervisors, one of the F.B.I. agents opened the locks on the three trunks that had not been opened the day before. All the trunks

---

* Positive testimony that hair was visible is not overcome by the fact that some witnesses did not see it.

were packed full of wigs. The New York City detective quickly determined that these were not the wigs he was seeking, and departed.

T.C.A. and the F.B.I. counted the wigs and wiglets in the four trunks, and reached a total of 452. Chen testified that the wigs were worth from $10.00 for wiglets to $300 for handmade wigs. Even at the customs estimate of from $9.00 to $36.00 apiece, the F.B.I. and T.C.A. reasonably assumed that the shipment was very valuable.

In a step which gives rise to part of Averell's attack on the Kennedy Airport inspections, McQuade let an F.B.I. agent take 10 wigs from each trunk to the F.B.I. office at the airport, where Chen inspected them. Chen identified them as manufactured by his father's company, by the material and the workmanship, and by the square-type plain bags and rectangular tags on some of the wigs. Chen said that the description of the men who delivered the wigs to the airport fitted Averell and Aguinaldo, and that he had not sold any wigs in square bags to Averell. The hijacked shipment, according to information previously sent by his father, was the first one to contain rectangular tags or to use bags which did not bear the firm symbol, the "Liberty Statue." The F.B.I. agent did not consider this to be "positive" identification, and asked Chen to obtain further information. Both recorded the factory numbers and workmen's numbers from eight wigs. Meanwhile, F.B.I. Agent Datz asked McQuade to accompany the shipment to Puerto Rico.

The investigation of the wigs had delayed the departure of the shipment, although its despatch on Friday evening was within the usual time for air cargo.

The extent of T.C.A.'s right to inspect is crucial both for the validity of the Kennedy Airport inspections and for the validity of the Puerto Rican search warrants, because the decisive identification of the wigs as part of the hijacked shipment did not come from the single trunk that was opened on February 17th.

### The Legality of the Inspections

Defendants attack the Kennedy Airport inspections as being a federal search without a warrant, citing Corngold v. United States, 367 F.2d 1 (9th Cir. 1966), which described a search by another air carrier as being "solely in aid of the enforcement of a federal statute."

Defendants' reliance on the *Corngold* case seems to be misplaced. That case was subsequently limited in Gold v. United States, 378 F.2d 588 (9th Cir. 1967). In any event, *Corngold* does not appear to be the law in this Circuit. United States v. Blum, 329 F.2d 49 (2d Cir. 1964), cert. denied, 377 U.S. 993, 84 S. Ct. 1920, 12 L.Ed.2d 1045 (1964).

In *Corngold*, the customs agents followed the shipper to the airport, and requested the carrier to open the packages after the shipper had left. In this case, T.C.A.'s agents first suspected that the shipment was not as described on the airway bill. Rather than the government agents prompting the inspection or even first suggesting it, T.C.A. called in all law enforcement agencies which might be concerned. I find, as the court found in *Gold*, that the search was not so connected with government participation or influence as to be characterized, as was the search in *Corngold*, as a "federal search, cast in the form of a carrier inspection." Of course, the F.B.I. agents were interested to discover if a federal crime had been committed, but their presence was initially in the carrier's interest. The airline had the right, and perhaps the duty, to discover if its facilities were being used for the commission of crime. "It is an act of responsible citizenship for individuals to give whatever information they may have to aid in law enforcement." Miranda v. Arizona, 384 U.S. 436, 477–478, 86 S.Ct. 1602, 1629, 16 L.Ed.2d 694 (1966). See United States v. Cowan, 396 F.2d 83, 87 (2d Cir. 1968).

After the first trunk was opened, F.B.I. involvement in the inspection became more intensified. Nevertheless, I find that the airline employees requested

the F.B.I. to determine if the wigs had been stolen. It was at McQuade's request that an F.B.I. locksmith opened the remaining trunks. Clearly, it was in the carrier's interest that the trunks not be damaged. It was also of concern to the carrier to ascertain whether it might incur liability for transporting stolen goods without the acquiescence of law enforcement personnel. The carrier's interest and concern did not end after the opening of the first trunk.

■ Defendants contend that the removal of the wigs by the F.B.I. goes beyond the right of inspection and confirms that the inspections were primarily for police purposes. I believe that the right to inspect includes the right to examine in such a way as to assure that there is no misuse of the carrier's facilities. In *Blum,* the customs agents removed, inspected, and counted unlawfully imported watch movements. In *Gold,* pornographic films were viewed by police officers on a projector. The fact that in the present case Chen examined the wigs in a different part of the airport is not a material difference from those cases.

■ The inspection clause in the T.C.A. tariff does not limit the purposes of inspection or the extent of inspection, as did the inspection clause in *Corngold,* 367 F.2d at 4, n. 3. In addition, the tariff rule which immediately follows the inspection clause is a requirement that the shipper comply with "all applicable laws, customs and other government regulations." When an authorized inspection discloses evidence of possible violation of the law against transporting stolen goods, the inspection need not terminate before the facts concerning the applicable laws are developed.

Defendants point to T.C.A.'s failure to bill the shipper for the difference in tariff rates, asserting that this impeaches the fiscal basis for the inspection. They overlook the fact that the charges were "collect," and that the wigs were seized before delivery was completed. In fact, the T.C.A. accounting department was later instructed to write off the charges completely because the "shipment was taken for evidence by F.B.I. agents."

Defendants also assert that there was no difference in rates, because the same tariff schedule covers both machine parts and "hair." Wigs, however, are quite different from raw hair and of much greater value. McQuade's testimony that the tariff rate for wigs is greater than that for machine parts should therefore be accepted as correct.

■ It is true that "the rights protected by the Fourth Amendment are not to be eroded by strained applications of the law of agency or by unrealistic doctrines of 'apparent authority.'" Stoner v. California, 376 U.S. 483, 488, 84 S.Ct. 889, 892, 11 L.Ed.2d 856 (1964). But the agency here is not strained or unrealistic, being based on an express authorization to the carrier, confirmed by the carrier's attorney. The Fourth Amendment protects the right of privacy, rather than any interest in the property seized. Warden, Md. Penitentiary v. Hayden, 387 U.S. 294, 303–306, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967). It is not unreasonable to require one who ships property by public carrier to waive his right to privacy to the extent of permitting inspection for carrier purposes. Carrier interest should not be limited to safety or tariff violations.

The consent to inspect contained in the tariff is therefore considerably broader than the consent given a hotel clerk or landlord to enter a dwelling. Thus, analogy to cases which disapproved of mere "apparent" consent to search a dwelling seems inappropriate. See Stoner v. California, supra; Chapman v. United States, 365 U.S. 610, 81 S.Ct. 776, 5 L.Ed. 2d 828 (1961); Cunningham v. Heinze, 352 F.2d 1 (9th Cir. 1965). Cf. United States v. Cowan, 396 F.2d 83 (2d Cir. 1968).

Finally, the defendants may not successfully distinguish the *Blum* case on the basis of the special search powers of customs agents (19 U.S.C. § 482). Not only was *Blum* decided on the basis of

the carrier's right of inspection, but the special authority of customs agents is available only in "border searches." United States v. Glaziou, 402 F.2d 8, 12 (2d Cir. 1968). In *Blum,* the shipment of watches was from Los Angeles to New York, and the inspection in New York was not within a border area.

For all the foregoing reasons, the Kennedy Airport inspections seem to be proper under this Circuit's ruling in the *Blum* case.

### (2) *The T.C.A. Search Warrant*

The F.B.I. agents worked continuously on the case during the ensuing week-end, and sent information to their San Juan office by telephone and teletype, which led to the issuance in Puerto Rico on Sunday, February 20, of a John Doe search warrant for the seizure of the trunks at the T.C.A. cargo quarters in the San Jose airport.

 When the trunks arrived in San Juan on Friday night, they were placed in an upstairs room at the T.C.A. cargo area, and F.B.I. agents took turns watching the staircase, so that they would see anyone who came to pick up the trunks. This did not constitute a seizure, as claimed by defendants, but merely surveillance to permit identifying and following anyone who came to pick up the shipment.

On prior shipments, Cruz had called to get the shipments before the airline's postcard notice to his mailing address had arrived. This time he had no prior notice of the shipment, and did not come to the airport prior to his arrest on Tuesday, the 22nd.

Chen went back to Cherry Hill on Friday night, and cabled his father. He received a reply, by telephone from Western Union about noon of Saturday, February 19, and relayed the information to Agent Doran. He reported that Color G–1, which was among the wigs he examined at Kennedy Airport, and which had not previously been imported into the United States, was in fact in the hijacked shipment. The evidence established that this information was relayed to the Puerto Rican F.B.I. office by telephone on the afternoon of February 19.

In a teletyped message to Puerto Rico on Friday night, Agent Doran had stated that the information was sufficient for seizure, but not for arrests, pending positive identification from Hong Kong. Agent Romanoff in Puerto Rico, however, did not apply for a search warrant until Sunday, after Agent Doran had relayed the contents of the Hong Kong cable. Doran had asked Chen for further information in addition to the cable, but this information did not come until February 21, and may be considered only in support of the San Jorge search warrant.

Agent Romanoff typed the T.C.A. search warrant and the supporting affidavit, which described the hijacking, the shipment of the mislabeled trunks, and the identification thus far made by Chen. The Romanoff affidavit recites that the individuals who delivered the trunks to T.C.A. at J. F. K. Airport had advised that they contained sewing machine parts, that they were consigned to Rodriguez Sewing Supplies, with a San Juan Post Office box number, and that T.C.A. employees had noticed human hair hanging from the end of one of the trunks. The affidavit further set forth that the trunks were opened and found to contain 448 wigs worth over $50,000 at retail value, and stated:

> "PHILIP CHEN, victim of the above 11/18/65 hijack, positively identified these wigs as having been manufactured by his father's firm in Hongkong and stated further that he had reason to believe these wigs were part of the shipment stolen from him on 11/18/65. He stated this based on the fact that some wigs had the manufacturer's tag listing size, worker's number, and quantity number."

The affidavit described the shipment of the trunks, their color and dimensions, and their exact location at the San Juan Airport.

Romanoff served the search warrant on the T.C.A. cargo manager shortly after noon on Sunday, February 20, and made an inventory, which he filed with the Commissioner.

Defendants attack the search warrant as defective in substance and in form, and also dispute Chen's identification as untruthful. The challenge to Chen's identification will be discussed in connection with the San Jorge search warrant.

### Attacks on Substance of Affidavit

█ McQuade, a person unfamiliar with the niceties of search warrant law, had no difficulty with the issue of probable cause. When he saw the wigs overflow the sides of the opened trunk, he said, "Someone is shipping stolen wigs." United States Commissioner Miller, when Romanoff presented the affidavit and asked him to sign a search warrant, considered that the evidence of a prior theft and a mislabeled shipment to a sewing machine company were enough facts to constitute probable cause in themselves.

Analysis of the Romanoff affidavit confirms these evaluations. The inference from theft of wigs, shipment of wigs under a false description, and the misleading name of the consignee, is reinforced by the information from Chen. Chen is described as positively identifying the wigs as made by his father's firm in Hong Kong, and as having "reason to believe" that they were part of the shipment that was stolen. The "reason to believe" is supported by reference to the "manufacturer's tag listing size, worker's number and quantity number." This is adequate to constitute probable cause.

█ While the affidavit is based almost exclusively on hearsay, it is obvious that the information is derived either from the affiant's own knowledge or that of fellow F.B.I. agents. The Commissioner had a substantial basis for crediting the source of the information, since "[O]bservations of fellow officers of the Government engaged in a common investigation are plainly a reliable basis

for a warrant applied for by one of their number." United States v. Ventresca, 380 U.S. 102, 109, 111, 85 S.Ct. 741, 747, 13 L.Ed.2d 684 (1965).

The recent case of Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L. Ed.2d 637 (January 27, 1969), does not alter this conclusion. The affidavit there recited seemingly innocent activity which would not in itself constitute probable cause without a tip from a confidential informant that the suspect was a known gambler. No basis for the statement that the informer was reliable was given and the affidavit did not describe the suspect's criminal activity in sufficient detail "so that the magistrate may know that he is relying on something more substantial than a casual rumor circulating in the underworld * * *." Id. at 416, 89 S.Ct. at 589. The shipment here was not ostensibly innocent activity. Moreover, Chen's identification of the wigs was not casual rumor, but an event witnessed by the F.B.I. and supported by the reasons for his belief. Chen was not an unidentified underworld informer, but the victim of the alleged crime.

The statement that Chen identified only "some" wigs is unduly emphasized by the defendants. They contend that "some" might mean three or four, and therefore there was no probable cause for believing that the minimum of $5,-000 prescribed in 18 U.S.C. §§ 2314 and 2315 was involved in the shipment. But if only one of the wigs was involved in the Weehawken hijack, the knowing possession of it would constitute a federal crime under 18 U.S.C. § 659. Even Chen's identification of about eight wigs, out of about forty which were shown him, supports probable cause to believe that other hijacked wigs might be in the shipment or in Averell's possession. "Where goods are of a common nature and not unique there is no obligation to show that the ones sought * * * necessarily are the ones stolen, but only to show circumstances indicating this to be likely." Vitali v. United States, 383 F.2d 121, 122 (1st Cir. 1967).

*Allegedly Formal Defects in the
T.C.A. Search Warrant*

Defendants make three attacks on the form of the search warrant and its service.

First is the failure of the search warrant or the supporting affidavit to specify the crime which was charged. The allegations, however, are adequate to show commission of the crime of knowing possession and interstate transportation of stolen goods. It is not necessary to state the section of law which is violated.

The illustrative form contained in F.R. Cr.P. Appendix to Forms, Form 15, does not contain a reference to any section of the United States Code alleged to have been violated. Thomas v. United States, 376 F.2d 564 (5th Cir. 1967), relied upon by defendant Averell, involved an affidavit which failed to allege facts which would give rise to probable cause that any federal crime had been committed. While a crime under state law may have been described, the court held that "It was necessary that the affidavit allege with at least some reasonableness that an offense against the laws of the United States had been committed."

The second attack is on the failure to serve the supporting papers. The evidence shows that the T.C.A. representative was handed a copy of the search warrant, but not of the affidavit, and that the place to be searched and the objects to be seized were described only in the affidavit. The warrant itself, over the words "grounds for search and seizure." said "(SEE ATTACHED)." There is no evidence that T.C.A. asked for any further details, or that the search exceeded what the warrant in its entirety authorized.

It is not constitutionally essential that the affidavit be attached to the search warrant at the time of the search. Sherrick v. Eyman, 389 F.2d 648, 652 (9th Cir. 1968). If the failure to leave a copy of the search warrant would not invalidate the search (United States v. Gross, 137 F.Supp. 244, 248 [S.D.N.Y.1956]), the failure to serve a supporting affidavit certainly should not.

The third attack is on the failure to file the search warrant promptly with the Clerk of the United States District Court, as required by F.R.Cr.P. 41(f). It was not entered in the Commissioner's docket book or filed in court until June 27, 1968, after Averell's current attorney began a personal search for the papers in San Juan.

This was the first search warrant which Commissioner Miller had ever issued. He had been told that an arrest would be made in a few days, and considered that the papers should not be filed until after the arrest. No report of Averell's arrest in Brooklyn on February 22 was made to Commissioner Miller.

A nine-month delay in filing a search warrant has been held not to be fatal. United States v. Lewis, 270 F. Supp. 807, 811 (S.D.N.Y.1967), aff'd, 392 F.2d 377 (2d Cir. 1968). It is well established that the return and filing of the warrant are ministerial acts. Evans v. United States, 242 F.2d 534 (6th Cir. 1957), cert. denied, 353 U.S. 976, 77 S.Ct. 1059, 1 L.Ed.2d 1137 (1957); United States v. Gross, *supra*; 79 C.J.S. Searches and Seizures § 76, p. 880. Even the loss of an affidavit after consideration by the magistrate will not constitutionally invalidate a search. Howard v. United States, 306 F.2d 392 (10th Cir. 1962).

Averell's claim of prejudice caused by the delayed filing was not substantiated. There was no doubt which affidavits were before the Commissioner when the warrants were issued. The affidavits and the return and inventory remained in his possession until the filing requirement was brought to his attention, obviating the possibility of fraudulent alteration. Absent prejudice, failure to file should not invalidate an otherwise lawful search.

(3) *The San Jorge Search Warrant*

On Tuesday, February 22, the F.B.I. in Puerto Rico obtained and executed a search warrant for wigs at Averell's

San Jorge apartment. This search warrant was based on information obtained from Cruz, in addition to that used in obtaining the T.C.A. search warrant. Cruz had been arrested that morning, and was interviewed by F.B.I. Agent O'Hara.

O'Hara's affidavit in support of the San Jorge search warrant referred to the theft of Chen's wigs at Weehawken, and stated that they were shipped to Puerto Rico by Averell, who knew they were stolen. It referred to Chen's identification of part of the 452 wigs seized under the T.C.A. warrant, and stated that a copy of Romanoff's affidavit was attached. The O'Hara affidavit further stated that Cruz had informed him that wigs previously shipped from New York to Rodriguez Sewing Supply in Puerto Rico were located in an apartment at 363 Calle San Jorge; that the prior shipments had been labelled "sewing machine parts," and had been sent from Rodriguez Sewing Supply in New York to Rodriguez Sewing Supply in San Juan; and that a T.C.A. porter had identified Cruz as the individual who picked up one shipment of "sewing machine parts" and that the porter had seen wigs in one carton which Cruz opened when he was loading them into his automobile. Further details were already before the Commissioner in the affidavit in support of a warrant of arrest against Cruz.

Cruz, who had been taken before Commissioner Miller and released on his own recognizance (he was never indicted), went along to Averell's apartment when the search warrant was executed. Averell was not in Puerto Rico, but his in-laws, the Lewises, were at the apartment. A total of 1,825 wigs and wiglets were seized. Chen later identified these as "Liberty Statue" wigs, saying that only about 50 came from other sources.

### Attacks on the San Jorge Search Warrant

Defendants make several attacks on the form and service of the San Jorge search warrant.

The first is that the name of the affiant was left blank on the printed form.

Absence of the affiant's name in a search warrant has been held to be a fatal defect (King v. United States, 282 F.2d 398 [4th Cir. 1960]), but under different circumstances. In that case, a fictitious name was used, and the true affiant was in no way disclosed. In the *King* case, the court found "a willful effort to mask the true source of the information, contrary to the letter and spirit of the law." The government was in fact unable to produce the affiant at the hearing on the motion to suppress. See also United States ex rel. Pugh v. Pate, 401 F.2d 6 (7th Cir. 1968); Dixon v. United States, 211 F.2d 547 (5th Cir. 1954).

United States v. Carignan, 286 F.Supp. 284 (D.Mass.1967), if correctly decided, is also distinguishable. There, a name was given on the search warrant which was not the name of the supporting affiant.

Since the requirement to set forth the name of the affiant is not contained in the Fourth Amendment itself, the necessity to look at another instrument for the name should not be regarded as a jurisdictional defect. An information may be amended at any time before verdict if substantial rights of the defendant are not prejudiced. F.R.Cr.P. 7(e); cf. United States v. Denny, 165 F.2d 668 (7th Cir. 1947), cert. denied. 333 U.S. 844, 68 S.Ct. 662, 92 L.Ed. 1127 (1948). While the court in the *Carignan* case denied a motion to amend the search warrant, I regard such relief as proper. The submission of O'Hara's affidavit fulfils the requirement that the accuser must take the chance of punishment for perjury. Veeder v. United States, 252 F. 414, 418 (7th Cir. 1918), cert. denied, 246 U.S. 675, 38 S.Ct. 428, 62 L.Ed. 933 (1918). It is inappropriate to void a search warrant because of a typing omission which has not been shown to have caused any prejudice. No prejudice could possibly have resulted here, for Cruz (a defendant named in the search warrant) was present in the Commissioner's office when the search warrant was issued, and he went along to the San Jorge apartment when it was executed.

■ The second attack is based on the assertion that a copy of Romanoff's affidavit of February 20 was not in fact attached to O'Hara's of February 22nd. I am satisfied that a copy was submitted to Commissioner Miller. In any event, a search warrant may be based on interrelated affidavits in the Commissioner's files, even if earlier submitted to obtain a warrant for the search of other premises. United States v. Serao, 367 F.2d 347 (2d Cir. 1966), vacated on other grounds, 390 U.S. 202, 88 S.Ct. 899, 19 L.Ed.2d 1034 (1967); United States v. Markis, 352 F.2d 860, 864 (2d Cir. 1965), vacated on other grounds, 387 U.S. 425, 87 S.Ct. 1709, 18 L.Ed.2d 864 (1967).

■ A third ground of attack is that the entire search warrant was not served on Mr. Lewis. As in the case of the T.C.A. warrant, I find that only the printed search warrant was left with Mr. Lewis, and that neither the O'Hara affidavit nor the Romanoff affidavit were left with him. Again as in the case of the T.C.A. warrant, no point was made of this at the time, and copies of the relevant affidavits were available if requested. Cruz was present, and had given the information on which the search warrant was based. He voiced only one objection, that the authorization to seize wigs did not include hairpieces. The term wiglets was more frequently used than hairpieces during the hearing, and wigs should be construed as including wiglets.

### The Challenge to Chen's Credibility

The final ground of attack on both search warrants is based on a challenge of Chen's credibility. The evidence shows no misrepresentation to the Commissioner concerning Chen's identification of the wigs, and no falsity of any statement attributed to him in the affidavits supporting the search warrants. The challenge is really an assertion that the Commissioner should have been informed of other facts which would have cast doubt on Chen's general credibility.

To what extent defendants may test the truth of assertions in the affidavits for a search warrant has not been explicitly decided or fully discussed in this Circuit. The question was raised but left open in both Rugendorf v. United States, 376 U.S. 528, 531–532, 84 S.Ct. 825, 11 L.Ed.2d 887 and United States v. Suarez, 380 F.2d 713, 715–716 (2d Cir. 1967). Cases which have permitted such inquiry deal primarily with the veracity of recitals of previous reliability of an unnamed informer. United States v. Freeman, 358 F.2d 459, 463 n. 4 (2d Cir. 1966); Note, Testing the Factual Basis for a Search Warrant, 67 Col.L.Rev. 1529, 1530 n. 18 (1967) (collating cases). There is clearly a difference between an attack on an anonymous informer and an attack on the victim of the crime, who is identified and quoted in the affidavit.

In view of the uncertainty of the law, and after an initial showing that there might be inaccuracies in the affidavit, extensive testimony as to Chen's prior reliability was admitted. See United States v. Halsey, 257 F.Supp. 1002, 1006 (S.D.N.Y.1966); United States v. Ramos, 380 F.2d 717, 720 (2d Cir. 1967).

■ For purposes of this case, the rule has been sufficiently stated in a recent decision of the Court of Appeals for this Circuit:

"Whether a search warrant was properly issued on probable cause is to be determined solely upon the information presented to the issuing magistrate, unless, of course, this is proved to have been false, to the knowledge of the affiant, in a material respect." United States ex rel. De Rosa v. La Vallee, 406 F.2d 807 (2d Cir. January 15, 1969).

Defendants cite the following information produced at the hearings which was known to the agents who signed the affidavits and which they assert would have so damaged Chen's credibility as to invalidate the Commissioner's finding of probable cause:

(a) Chen had identified wigs as part of the hijack on prior occasions and was unable to prove his charge.

(b) Chen was given a lie detector test by the New Jersey police and the results were termed "inconclusive."

(c) Averell was in the wig business and Chen had sold substantial quantities of wigs to him and the firm by which he was employed.

(d) Chen had seen only 40 wigs out of about 450 in the trunks and was able to identify only eight with certainty.

It was established that the New York F.B.I. was aware of these facts, but not that they were transmitted to the Puerto Rico affiants, O'Hara and Romanoff.

■ I find that the failure to submit these facts to the Commissioner did not amount to a material misrepresentation.

(a) The inconclusive nature of Chen's prior identifications did not destroy his identification of the wigs in this case. In a New Jersey case where six wigs were seized from a tavern-owner by local police, a disposition was arranged by the local defendant's counsel under which the charge was withdrawn and a general release given; it appeared that the wigs were in fact from Chen's stock, but that he was not 100% sure that they were stolen from him. In a Staten Island case it appeared also that the wigs were Chen's "Liberty Statue" wigs, and that they had in fact been stolen, but it was later proved that they were stolen from an established Staten Island wig dealer, and he was able to show that he had bought them from Averell's New York associates.

In the present case, Chen's identification was made in the presence of the F.B.I., which had not handled the prosecution of either of the earlier cases. The crucial point, not covered in the other cases, was to show that the wigs were part of the last shipment from Hong Kong, and this was confirmed by two inquiries from Hong Kong. Moreover, the knowledge of theft here was supported by the suspicious circumstances of the shipment, the removal of labels, and the participation in the shipment by Averell, who had been present at the hijacking.

The defendants assert that information from Hong Kong had not been received when the first warrant was issued on February 20. This charge was based on a patent mistake. The telegram received at the Western Union office in Camden, New Jersey, at 10:52 a. m. on the 20th, bears the stamp "Duplicate of Telephoned Telegram." On the lower right hand corner, below the Cherry Hill telephone number, appears the following in the form of a rubber stamp with the underlined items inserted in ink:

"No. To <u>Mr. C.</u>
By <u>D.A.</u> At <u>140P</u> to be
 <u>MLD</u>"

A Western Union supervisor from New York City testified that "D.A." indicated "don't answer" at 1:40 p. m., meaning that there was no response after several attempts to reach Chen by telephone. It is the defendant's contention that the telegram was mailed and not received by Chen until February 21, after the warrant to search the T.C.A. cargo area was issued. The New York City supervisor's testimony cannot be credited, for clearly the "D.A." represents merely the initials of the person who reached Chen by telephone, stamped the telegram, and, pursuant to instructions from Chen, mailed a copy of the telegram. In any event, the testimony is inadequate to overcome the plain notation on the cablegram that it was a duplicate of a telephoned message. Chen testified that he immediately called Agent Doran, who in turn testified that this corroborating evidence was telephoned to the Puerto Rican F.B.I. office at 3:15 on the same day, Saturday. A handwritten notation by Doran on an F.B.I. report confirms his testimony.

This refutes the contention that the reference to Chen's identification in the affidavit, quoted above, was intentionally inaccurate. Averell's brief cites an interoffice teletype sent from New York to the F.B.I. office in Puerto Rico. He argues that where the February 18 teletype stated that Chen "was unable to positively state at this point that wigs from hijacked truck," the wording was unjustifiably altered in the February 20 affidavit to say that "he had reason to

believe these wigs were part of the shipment stolen from him." However, this argument ignores the telephone conversations between F.B.I. agents wherein the additional information was provided. More than adequate evidence was presented to substantiate the affidavit's allegation.

By February 21, before the O'Hara affidavit was resubmitted in connection with the San Jorge search warrant, Chen had received a second cable from his father in Hong Kong and had talked with him by 'phone, and could confirm that the numbers on the eight tags which had been copied were in fact numbers from his father's factories.

(b) The fact that a lie detector test of Chen was inconclusive proves nothing, except perhaps that lie detectors are often inconclusive. A lie detector test of Averell was also inconclusive.

(c) The fact that Averell was in the wig business, and had bought wigs from Chen, supports the probability of the goods being stolen, for the F.B.I. reports indicate that he had not discussed with Chen his plans to open a wig business in Puerto Rico. Concealing his Puerto Rican venture from his principal source of supply indicates that he was not using legitimately acquired goods in the Puerto Rican venture.

(d) Finally, the theory of sampling is too well accepted for defendants to complain that only about 10% of the New York wigs were inspected by Chen and only eight, whose tag numbers were copied, were definitely identified. If wigs picked at random had been stolen, it was reasonable to believe that the whole shipment, and similar prior shipments, consisted of stolen goods.

That the strengths and weaknesses of the government's case were not all set forth in the affidavits does not appear to be reason to invalidate the search warrants. If this were the case, most affidavits would be lengthy briefs, carefully arguing the inferences to be drawn from every fact presented. The microscopic examination which defendants have made in order to impugn these affidavits is not in keeping with the "common sense and realistic" approach mandated by *Ventresca*.

Even lawyer-agents of the F.B.I. must act with speed, working nights and weekends, to keep ahead of their criminal adversaries. An F.B.I. search warrant is entitled to be judged under the *Ventresca* standards, even though it was not drawn by a rural constable. See Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (January 27, 1969).

Defendants' attack on the search warrants in this case consumed twelve court days, during which 25 witnesses were examined, and over a hundred exhibits marked. Briefing the issues after trial required more than a month. If search warrants are to be utilized at all, they cannot wait upon such intricate research, so long as adequate facts exist to show probable cause for believing that a crime is being committed.

In evaluating the facts, it is important to be mindful of the difference between the probable cause necessary to support a search warrant and the strict proof necessary to support a jury verdict. If the case is tried, a jury must be satisfied beyond a reasonable doubt on all the evidence, that Averell and Aguinaldo shipped stolen goods from New Jersey to New York and/or from New York to Puerto Rico, knowing that they were stolen. A treatise which suggests, in its latest edition, that search warrant affidavits may be challenged as untruthful, concludes with the statement that

> "Probable cause, not certainty, is the constitutional standard." 4 Barron & Holtzoff, Federal Practice and Procedure (1964 Supp.) § 2496, n. 46c.

To summarize, this court holds that the affidavits were factually accurate and that no material information was withheld from the Commissioner which would have prevented a finding of probable cause, assuming that an attack on the veracity of an affidavit for a search warrant is permissible where there is a substantial challenge to the credibility of a known victim.

#### (4) *The Aguinaldo Handcuffing*

Averell was arrested by F.B.I. agents at his Brooklyn apartment in the afternoon of Tuesday, February 22, on the basis of a warrant issued by Commissioner Miller that morning in San Juan. Aguinaldo was in the apartment at the time.

Aguinaldo was frisked, but not arrested, according to the Agents' testimony. He left the apartment with two F.B.I. agents when they took Averell to their headquarters in New York for questioning. It is undisputed that Aguinaldo was handcuffed to Averell from the time they left the apartment until they arrived on the sixth floor of the F.B.I. building.

Agent Doran said that Aguinaldo went voluntarily. He gave as one reason for the handcuffing that it was for Averell's protection. Since Averell and Aguinaldo were known to be friends and business associates, this explanation is unacceptable. The second reason advanced by Doran was the safety of the agents during the ride. Two agents in a car with two strong men might well have run a risk of surprise or escape if the two men were free to act in concert against them. This alternative reason, however, destroys the F.B.I. claim that Aguinaldo was not in custody during the trip to Manhattan.

▆▆ When the agents restricted his liberty of movement to such a degree, Aguinaldo was clearly in the custody of the F.B.I. Cf. Kelley v. United States, 111 U.S.App.D.C. 396, 298 F.2d 310 (1961). Since the agents do not contend that they had reasonable cause at this time to believe that Aguinaldo was Averell's co-conspirator, the arrest was unlawful. United States ex rel. Catanzaro v. Mancusi, 404 F.2d 296 (2d Cir. December 2, 1968). The arrest cannot be made lawful by what a subsequent search discloses. Henry v. United States, 361 U.S. 98, 102–103, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959).

▆▆ After the arrest, an F.B.I. agent took Aguinaldo's brief case from his car, which was parked less than a block away. The evidence is in conflict, but I find that one of the agents took Aguinaldo's car keys, removed a briefcase from his car, locked the car, and returned the keys to Aguinaldo. I do not believe that Aguinaldo had left his briefcase on the seat of an unlocked car on a Brooklyn street. The testimony that Aguinaldo voluntarily gave the keys to the agent and requested him to obtain his briefcase as a favor was not persuasive. A person in custody does not normally invite the arresting officers to obtain incriminating evidence. Moreover, if he were not handcuffed, Aguinaldo could have locked his own car, and decided for himself whether to take along his briefcase or to leave it locked in the trunk, or to proceed to F.B.I. headquarters in his own car. I hold that the briefcase was seized in connection with an illegal arrest. The government did not sustain its heavy burden of establishing voluntary consent to search. United States v. Como, 340 F.2d 891 (2d Cir. 1965).

Had the arrest been lawful, the subsequent search of Aguinaldo's automobile less than one block away, might have been valid as incidental to the arrest. Moodyes v. United States, 400 F.2d 360 (8th Cir. 1968). However, the holding that Aguinaldo's custody was unlawful makes this rule inapplicable.

According to the F.B.I., the only papers taken from Aguinaldo's briefcase were the shipper's set of airway bills for the February 16 shipment from Kennedy Airport. These should be suppressed. Aguinaldo asserts that the F.B.I. also kept receipts for the purchase of the trunks, and carbon copies of four letters he had written to Averell. He did not recall the contents of the letters, and there is no other evidence that any such letters or receipts were seized. If they are found hereafter, they must also be suppressed.

At F.B.I. headquarters, Aguinaldo was questioned by two agents and then released, with his briefcase (minus the airway bills). He was questioned separately from Averell, and told the F.B.I. agents stories about some of his activities with Averell and Cruz, including the delivery of the four trunks to Kennedy Airport.

I refuse to accept his version of the interview. For one thing, his story was too imaginative to be believable. He asserted that his briefcase was taken in and out of the interview room several times, but he could not say if the number of occasions was less than one hundred. He claimed to have been questioned by relays of agents, but could not say whether there were four or twelve in all. He put the length of his questioning at two and one-half hours, while the F.B.I. log showed that his interview lasted only 44 minutes. Aguinaldo denied making statements to the F.B.I. agents, which both Kelly and Conley said that he made, which at the time might have been regarded as exculpatory, and which the agents would not have had any reason to fabricate. There is no reason to doubt Kelly and Conley on these points.

 This does not end the matter. The interrogation was custodial in nature, and Aguinaldo became a potential defendant shortly after the beginning of the interview. Therefore, the safeguards required by Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), were appropriate. Johnson v. New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed. 2d 882 (1966). Aguinaldo denied being given the *Miranda* warnings before questioning began and asserted that he was repeatedly refused permission to telephone his attorney. On the other hand, an interviewing agent testified as follows:

"I immediately told him that he did not have to talk with me and discuss the matter if he did not desire to do so.

"I asked him if he would like to contact an attorney prior to having any conversation in this regard.

"I told him that he had a right to stop the interview or leave at any time if he so desires.

"I also told him that any statement he would furnish could be used in a Court of law against him and that I could not make any promises of any consideration whatsoever in this regard.

"Mr. Aguinaldo at this point was (sic) stated that he was willing to talk with myself and agent Kelly and he stated that he did not have need to talk with an attorney at this point.

"I indicated to him that he could use the telephone to talk with an attorney at any time during the course of the interview."

The agent's formal report and handwritten interview log corroborate this testimony. I accept this statement, but I am compelled to find that the warnings do not comply with *Miranda* standards. Aguinaldo was not told that he had the right to have an attorney present during the interview. He was told only that he could contact or telephone an attorney. Moreover, nothing was said about the right to have an attorney appointed prior to questioning if he could not afford one. While the *Miranda* warnings need not be repeated verbatim, the warnings given here were inadequate under this Circuit's most recent ruling, United States v. Fox, 403 F.2d 97, 100 (2d Cir. 1968). See also Groshart v. United States, 392 F.2d 172, 175 (9th Cir. 1968).

 The information furnished to the F.B.I. by Aguinaldo on February 22, 1966 must therefore be suppressed.

In accordance with current practice, Aguinaldo's motion for the return of the suppressed documents is denied without prejudice to a renewal thereof after trial. United States v. Birrell, 276 F.Supp. 798, 814–817 (S.D.N.Y.1967).

(5) *Release of the Wigs to Sylvester & Sons*

The seized wigs were forwarded from Puerto Rico and placed in the office of the United States Marshal of this district. On January 20, 1967, pursuant to court order, the defendants and their attorneys were permitted to examine the wigs. Averell had two photographers and two wig experts accompany him.

Chen requested the release of the wigs to him in November, 1967, maintaining that prolonged storage would cause such deterioration as to render his merchandise valueless. Without notice to the

court or the defendants, almost all the wigs and wiglets (about 2,300) were surrendered. Only four wigs and four wiglets were retained. Chen posted a bond in the amount of $20,000, representing the depreciated value of the wigs. While some photographs of the wigs were taken by the government, the distinguishing characteristics of each wig are indiscernable.

Inspection by the court of the remaining wigs shows that they include none of the eight whose tag numbers were recorded by Agent Doran and Chen during the T.C.A. inspections for comparison with the Hong Kong records.

Arguing that Averell's new counsel had not inspected the wigs and that the prior examination had been inadequate, defendants sought as part of the pending motions to have additional discovery and inspection. The motion was granted by this court without objection by the government. Defendant's counsel did not inspect promptly, because of the demands of the hearing. It was only during the latter part of the hearings on the motions to suppress that the court and the defendants were informed that most of the wigs had been released to Sylvester & Sons a year earlier. Chen stated that almost all the wigs had been sold, and a directive by the court to produce any which remained in his possession has yielded only some fifty wigs which Chen states were not his.

The defendants assert that the release of the wigs requires a dismissal of the indictment, arguing that the government had been made aware of Averell's claim of ownership of the wigs by his plea of not guilty, and by his affidavit in support of his first motion to inspect, and by various documents which established that he claimed to have purchased the wigs from Chen and other sources. The government had seized the wigs for use as evidence, as shown by the T.C.A. waybill, among other things. If Chen had not sought the return of the wigs, it is fair to assume that they would be available at the trial.

The "spoliation" of the wigs by the government amounted to a suppression of evidence. The action appears to have been thoughtless, and not based on any intent to hurt defendants. If this suppression had been shown to be a denial of material evidence tending to exculpate the accused, this court would be required to grant relief. Only one case has been cited for the proposition that an indictment may be dismissed on a showing of negligent spoliation of evidence necessary to the defense. United States v. Heath, 147 F.Supp. 877 (D.Haw.1957), appeal dismissed, 260 F.2d 623 (9th Cir. 1958). There the defendant had voluntarily given the Internal Revenue Service some of his books and records, including documents in his own handwriting which might disprove wilful intent to evade taxes. Finding that the government was unable to produce these documents, and that the documents were "relevant to the charges in the indictment and necessary for the preparation of the defense," the court dismissed the indictment.

There is authority in this Circuit for the granting of a new trial where the government negligently failed to produce some of the defendant's documents in its possession after the trial court had ordered disclosure. United States v. Consolidated Laundries Corp., 291 F.2d 563 (2d Cir. 1961). It was stated that

> " * * * it was the duty of the Government to keep the evidence of which it was custodian in such manner that it would be available for use upon the trial by all parties." Id. at 570.

See also Kyle v. United States, 297 F.2d 507, 513–515 (2d Cir. 1961).

An additional consideration is the rule that suppression by the prosecution of evidence favorable to the accused violates due process when the evidence is material as to guilt or punishment, irrespective of the good faith or bad faith of the prosecutor. Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

In the *Brady* case, as in almost all the cases cited by defendants, the relief granted was a new trial, where the suppressed evidence would be available. They do not discuss the problem of spoliation, where the evidence is no longer available for use at all. Even where the relief sought was a new trial, the Supreme Court has recently explicitly declined to determine the degree of prejudice which must be shown to merit relief. Giles v. Maryland, 386 U.S. 66, 73–74, 87 S.Ct. 793, 17 L.Ed.2d 737 (1967). Cf. Napue v. Illinois, 360 U.S. 264, 269–270, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959).

■ The extent of any prejudice to defendants in this case from the absence of the wigs will depend on the nature of the evidence which the government presents on the trial, and the evidence available to the defendants to meet the government's case. The issues on the trial will be different from the issues presented on the motions for suppression.

■ If the wigs had been destroyed without any fault of the government, the prosecution could surely continue. To forbid a trial of guilt or innocence, where the unavailability resulted from negligence, should require a showing of severe and irremediable prejudice.

The government points to documentary evidence which may substantiate guilt without production of the wigs, and to other means by which the defendants may counter any evidence of their guilt. The issue concerning the release of the wigs was brought up toward the end of the suppression hearing, and was not fully explored by the parties or by the court.

It has been recently stated that while Rule 12(b), F.R.Cr.P., is designed to encourage as many motions as possible before trial, Rule 12(b) (4) recognizes that a decision must occasionally be postponed until trial when the merits of the motion depend upon facts which will not be fully developed until trial. United States v. Dooling, 406 F.2d 192 (2d Cir., January 21, 1969). It has been repeatedly held that the materiality of evidence favorable to the accused under the *Brady* standard may best be determined at or after trial. United States v. Keogh, 391 F.2d 138, 146–149 (2d Cir. 1968); United States v. Westmoreland, 41 F.R.D. 419 (S.D.Ind.1967); United States v. Manhattan Brush Co., 38 F.R.D. 4 (S.D.N.Y. 1965). A full discussion of the need for a trial to disclose materiality and the factors against the reopening of this hearing to give opportunity for the full investigation of materiality may be found in United States v. Birrell, 276 F.Supp. 798, 817–820 (S.D.N.Y.1967).

■ The problem which is presented could have been avoided if the defendants had exercised their rights to demand a speedy trial, or if the government had developed a suitable procedure to avoid burdensome storage of evidence, or hardship on claimants of such evidence. An appropriate procedure in the future would seem to include giving the defendant notice of any proposed release, and obtaining a court order so that enough evidence may be retained to prevent any prejudice. See e. g. 28 U.S.C. § 2463; 4 D.C. Code § 4–158. In the event the evidence is perishable, the court might frame an order preserving the rights of the defendant, or might order an immediate trial. If the goods are uniform and there can be no dispute as to identification, the retention of samples may not be objectionable. United States v. Zeoli, 170 F.2d 358 (3rd Cir. 1948).

The motions to suppress the evidence obtained from the search warrants are denied. The motion to suppress the statements and evidence obtained from Aguinaldo is granted.

The defendants' motion to dismiss the indictment, based upon alleged suppression of evidence, is denied without prejudice to its renewal at or after trial.

No evidence has been presented on the other portions of defendants' motion. These are also denied.