**UNITED STATES of America, Plaintiff-Appellee,**

v.

**James Thomas CHERRY, Defendant-Appellant.**

No. 84–1864.

United States Court of Appeals, Fifth Circuit.

April 23, 1985.

Opinion on Denial of Rehearing June 17, 1985.

Robert Ramos, Fed. Public Defender, El Paso, Tex., for defendant-appellant.

Helen M. Eversberg, U.S. Atty., El Paso, Tex., Sidney Powell, Michael S. McDonald, Asst. U.S. Attys., San Antonio, Tex., Maury S. Epner, Atty., Dept. of Justice, Washington, D.C., for plaintiff-appellee.

Before RANDALL, JOHNSON and GARWOOD, Circuit Judges.

RANDALL, Circuit Judge:

In *United States v. Cherry*, 733 F.2d 1124 (5th Cir.1984) (*Cherry I*), we set aside the murder conviction of defendant-appellant James Thomas Cherry, Jr., on the ground that his confession and other incriminating statements were obtained in violation of his *Miranda* rights and thus their admission at trial constituted reversible error. Following *Cherry I,* Cherry was once again tried in federal court and found guilty of murder. On appeal from his second murder conviction, Cherry asserts primarily that the district court, while properly holding the incriminating statements inadmissible, erred in applying the exclusionary rule's "inevitable discovery" exception to allow the admission of the murder weapon and related physical evidence. We hold that the district court misapplied the inevitable discovery exception both as recently adopted by the Supreme Court and as earlier formulated by this court. However, because our statement in *Cherry I* characterizing as tainted Cherry's consent to the search that led to the discovery of the murder weapon is inconsistent with principles recently articulated by the Supreme Court in *Oregon v. Elstad,* — U.S. —, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), we remand the case for the district court to consider the validity and effect of the consent in light of fourth and fifth amendment concerns.

## I. BACKGROUND

### A. *Facts*

Most of the facts pertinent to this appeal were depicted in detail in *Cherry I:* [1]

On the morning of December 6, 1982, a dead man's body was found in the parking lot of an elementary school on the Biggs Field section of the military reservation at Fort Bliss, Texas. The cause of death was determined to be three gun-

---

1. At the suppression hearing preceding the second trial, both the parties and the district court expressly relied on the evidence introduced at the first suppression hearing in making their respective arguments and decisions. *See* Record Vol. VI, at 3, 23. Thus, since most of the facts relevant to the issues now before us were disclosed only at the first suppression hearing and subsequent trial, we do the same. Record citations have been updated to refer to the current record.

shot wounds to the back and neck. The deceased was identified as Jesus Manriquez, a taxicab driver employed by The Checker Cab Company in El Paso, Texas. The Army's Criminal Investigations Detachment ("CID") and the FBI were notified.

The following morning, on December 7, 1982, the deceased's taxicab was found in downtown El Paso, Texas. During an FBI search of the cab, a military identification card and a Virginia driver's license in the name of U.S. Army Private James Thomas Cherry, Jr. were found on top of the sun visor.

At noon that day, FBI Agents Donald Graham and Gene Smith went to CID headquarters at Fort Bliss to see if the CID could help them locate Cherry. CID records revealed that Cherry was stationed on the base and Agents Graham and Smith, along with two CID agents, drove to Cherry's company area to locate him. They contacted Cherry's company commander, Captain John Spiridigliozzi, and told him they wanted to talk to Cherry. Captain Spiridigliozzi informed the agents that Cherry was due to report to battalion headquarters at 1:00 p.m. The FBI and CID agents then walked to the battalion commander's office to inform the battalion commander that they wanted to question Cherry.

At 1:00 p.m., Cherry reported to battalion headquarters where he was met by Sergeant Dave Bates, a member of his company. Sergeant Bates told Cherry that "there were some people in Battalion Headquarters that were looking for him." Record Vol. [II] at 119. Bates and Cherry then walked into battalion headquarters whereupon Agent Graham approached Cherry and identified himself as an FBI agent. Graham told Cherry that he wanted to ask Cherry some questions. The FBI and CID agents then surrounded Cherry and walked him to a waiting FBI car. Record Vol. II at 39–40. Cherry was put in the back seat and flanked by two of the agents. *Id.* The four agents and Cherry then drove to CID headquarters where Cherry was to be questioned.

Once they arrived at CID headquarters, the FBI agents showed Cherry their badges and gave him his *Miranda* warnings via an advice of rights form. Cherry indicated that he understood his rights and signed the form. The two FBI agents then interrogated Cherry for about an hour, during which Cherry denied any involvement in the murder. Although no physical force had been used in bringing Cherry to CID headquarters for questioning, Agent Graham testified that Cherry was in custody and was not free to go. Record Vol. [II] at 44. Once this interrogation had concluded, the agents obtained Cherry's consent to search his barracks. The agents took Cherry to his barracks and conducted a search of his locker and personal belongings. During this search, the agents found a billfold in a trash can located in the latrine area of the barracks. Later that afternoon, the billfold was identified as the victim's.

733 F.2d at 1125–26. Also in the course of the search, the agents noticed that the ceiling of the barracks was comprised of removable accoustical tiles. While looking for something with which to boost themselves up to the ceiling, the agents found a sneaker footprint on top of Cherry's dresser. Once at ceiling level, the agents removed one panel and attempted a search of the above space. Because the area was dark, however, the agents were unable to conduct a thorough search at that time. Record Vol. VI, at 12. As *Cherry I* describes further:

> The search was completed at about 4:00 p.m. The agents then returned Cherry to CID headquarters, where they asked him to sign a written statement, which he did. At about this time, the FBI agents learned that the last location to which the victim's taxicab had been dispatched was Cherry's barracks. This dispatch had occurred at 6:17 p.m. on December 5, 1982, the night before the victim's body was found.

At approximately 5:30 p.m. on December 7th, the FBI agents told the CID what they had learned with regard to the investigation. The FBI and CID then discussed who would keep Cherry in custody. The FBI agents informed the CID that they wanted to have more evidence before seeking an arrest warrant. However, the FBI agents also told the CID that if the military was going to confine Cherry there was no need for the FBI to secure an arrest warrant until the FBI finished interviewing him the following day. There was conflicting testimony at trial whether military authorities decided to confine Cherry because they were asked to by the FBI, or whether they had independently decided to do so as a result of the evidence linking Cherry to the murder. In any case, at approximately 7:00 p.m., Captain Spiridigliozzi signed a confinement order for Cherry, which charged him with murder under Article 118 of the Uniform Code of Military Justice, 10 U.S.C. § 918 (1982).

Cherry spent the night in a holding cell at the Military Police station, and was given some bedding and canned rations by members of his company. Early the next morning, December 8, 1982, Sergeant Carlton Crider arrived at the MP station to stand by while Cherry was in custody. Crider talked to Cherry and warned him: "[Regardless whether] you did anything or you didn't, don't say anything. Don't say nothing to anyone. Just wait until you see a lawyer." Record Vol. [II] at 130–31. At 11:00 a.m., Sergeant Crider took Cherry over to the CID office for interrogation by FBI agents Chris Clark and Terry Youngblood.

Before interrogation began, Cherry was informed of his *Miranda* rights. He indicated that he understood these rights and signed a written waiver of these rights. Cherry then began to answer Clark's and Youngblood's questions regarding his activities the night that the murder occurred. The FBI agents told Cherry that there were certain inconsistencies in his story and apprised him of the evidence that had been uncovered connecting him to the murder.

After conveying this information to Cherry, the FBI agents noticed that he was beginning to break down, and they sensed that they might be able to elicit a confession from him. Record Vol. [II] at 99–100. Agent Clark testified that at this point in the interrogation, "We asked [Cherry] if he didn't want to make a complete statement or story and if he did not want to tell us what the truth of the matter was. [Cherry] indicated that he did have some reservations. And he said, 'Maybe I should talk to an attorney before I make a further statement.'" *Id.* at 102. After Cherry said this, Agent Clark told him that the advice of counsel was one of Cherry's constitutional rights. Cherry then asked, "Why should I not get an attorney?" Clark answered by suggesting that an attorney would protect Cherry's rights and would most probably tell him to remain silent. *Id.* at 103. *See also* Government Exhibit 7 at 20. Although the FBI agents did not attempt to put Cherry in touch with an attorney, they did ask him if he wanted to be alone to consider whether to make any further statement. Record Vol. [II] at 107. Cherry then said, "I want to talk to the sergeant who brought me over." *Id.* at 108. Clark left the interrogation room to see if he could locate Sergeant Crider, who was posted at CID headquarters while Cherry was being interrogated. Clark was informed by CID personnel that Sergeant Crider had been replaced by Sergeant Curtis Brown, and Clark relayed this information to Cherry. *Id.* at 108–09.

733 F.2d at 1126–27. A few minutes later, Agent Graham entered the room and told the other agents that he had learned from Cherry's fellow soldiers that Cherry had bought and recently had been seen in the possession of a .32 caliber automatic handgun. Upon being informed of this information, Cherry asked, "Haven't you found the gun yet?" and told the agents that the gun was hidden in the northeast corner of the

area above his ceiling in the barracks. Cherry then both orally and by signing a written form consented to a second search of his barracks. Record Vol. II, at 90–91. Agent Graham left with a CID agent to conduct the search, and soon thereafter Cherry confessed to the remaining agents.

Some time later, Agent Graham contacted the interviewing agents from Cherry's barracks for additional information concerning the location of the gun. With the added directions Cherry provided, the agents were able to find a .32 caliber pistol, thirteen .32 caliber bullets, and a pistol case secreted away in the space above Cherry's ceiling. Record Vol. VI, at 16. At about 2:15 p.m., Cherry was fingerprinted and transported to an El Paso County jail. He was ultimately charged with second degree murder.[2]

### B. First Trial

Before trial, Cherry moved to suppress, *inter alia*, all incriminating statements made by him after his arrest on December 7 and prior to appearing before a magistrate and the .32 caliber pistol, bullets, and pistol case found in the area above his ceiling in the barracks. The district court denied the motion, and Cherry was subsequently found guilty of second degree murder and sentenced to thirty years' imprisonment. On appeal, we reversed the conviction on the ground that Cherry's incriminating statements were obtained in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), and therefore were inadmissible at trial. Specifically, we held that the agents, faced with Cherry's ambiguous request for counsel, had deprived Cherry of his rights by failing to limit further questioning to clarification of his request.[3] *Cherry I*, 733 F.2d at 1132.

In the course of the opinion, we also observed that (1) Cherry was arrested within the meaning of the fourth amendment as of 1:00 p.m. on December 7, 1982,[4] *id.* at 1129 n. 9, and (2) the violation of *Miranda* tainted the subsequent consent to the second search, *id.* at 1132 n. 15.

### C. Second Trial

In anticipation of his second trial, Cherry moved to suppress all evidence that was the subject of his motion to suppress at his first trial as well as the set of fingerprints the FBI agents had obtained from him following his confession on December 8. These fingerprints were incriminating because they had been positively compared to a fingerprint found in the victim's abandoned taxicab. Cherry asserted that the government obtained the tangible evidence through the exploitation of his illegal arrest and therefore the evidence was inadmissible as "fruit of the poisonous tree."[5] The government in response conceded that Cherry's statements were inadmissible but asserted that the weapon and fingerprint evidence could be admitted under the inevitable discovery doctrine as outlined by the Supreme Court in *Nix v. Williams*, —— U.S. ——, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984).

Following a hearing on Cherry's motion to suppress, the district court ruled that all incriminating statements attributable to Cherry were inadmissible. In holding that the statements made by Cherry specifically before the *Miranda* violation were excludable, the court found that Cherry's arrest at 1:00 p.m. on December 7 was without probable cause and that, as a result, the statements made on that date were the fruits of an illegal arrest. While it is not altogether clear, the court apparently considered the confession and other incriminating state-

---

**2.** Cherry was not taken before a magistrate until 12:20 p.m. the next day, December 9, 1982.

**3.** Reliance on this ground for decision rendered consideration of Cherry's other claims unnecessary.

**4.** We, however, declined to determine whether Cherry was arrested with probable cause.

**5.** Although Cherry relied on the holding in *Cherry I* as a ground for the exclusion of the statements, he also alleged that all statements made after his arrest were inadmissible under 18 U.S.C. § 3501 (codification of "McNabb-Mallory" Rule).

ments made after the *Miranda* violation on December 8 to be excludable on the ground discussed in *Cherry I*. With respect to the .32 caliber weapon and related equipment, the district court acknowledged that, under the law of the case, the *Miranda* violation tainted Cherry's description of the location of the pistol and rendered invalid Cherry's consent to the second search that led to the seizure of the gun. The court, however, ruled that the weapon was nonetheless admissible because the government had carried its burden of demonstrating the applicability of the "inevitable discovery" exception to the exclusionary rule. The court stated:

> In the instant case, the pistol was discovered as a proximate result of the Defendant's tainted confession. The confession did not occur, however, until the afternoon of December 8, 1982. By that time FBI agents had obtained so much independent evidence that a search warrant for the area would inevitably have been obtained, and the pistol would inevitably have been discovered. By the afternoon of December 8, the FBI had discovered the victim's taxicab abandoned in Central El Paso with the Defendant's military identification and Virginia driver's license on top of the sun visor. They had also learned from the records of the Checker Cab Company that the same taxicab had been dispatched on its final trip to the Defendant's barracks at Fort Bliss, Texas. Furthermore, the victim's wallet had been found in a trash receptacle in the latrine area of the barracks occupied by the Defendant. FBI agents had interviewed other members of Cherry's unit who had seen him recently in possession of a .32 caliber pistol, which matched the description of the murder weapon, and they had located the soldier who admitted actually selling the pistol to the Defendant. Finally, on the previous day, December 7, 1982, two FBI agents had observed a dusty footprint on top of a dresser in the Defendant's barracks, which constituted the rough equivalent of an arrow pointing to the ceiling as a hiding place. In short, as of December 8, 1982, FBI agents had more than enough probable cause to obtain a search warrant for the Defendant's specific area of the barracks building, and they had good and sufficient reason to make a specific search of the false ceiling where the gun was found. The ultimate discovery of the pistol was inevitable, and it is admissible in evidence under this well-settled exception to the exclusionary rule.

Record Vol. I, at 52–53. Finally, the district court held that the set of Cherry's fingerprints obtained subsequent to his arrest could be introduced at trial because (1) a set was independently available from army records and (2) Cherry's arrest on a charge of murder and the taking of his fingerprints were inevitable. At trial, the physical evidence was admitted, and Cherry was again found guilty of second degree murder and sentenced to thirty years' imprisonment.

On this appeal, Cherry challenges the district court's evidentiary rulings, arguing primarily that the court misapplied the inevitable discovery exception. Although the government defends the district court's holdings, it also alternatively argues with respect to the admissibility of the .32 caliber pistol and accompanying items that, contrary to the statement made in *Cherry I*, Cherry's consent to the second search of his barracks and ceiling was not tainted by the *Miranda* violation. Because the district court relied on the inevitable discovery exception in admitting the evidence at issue, we consider first the applicability of that doctrine to the case at bar and then whether the validity of Cherry's consent to the second search should be re-examined.

## II. THE INEVITABLE DISCOVERY EXCEPTION

### A. *Nix v. Williams*

As mentioned above, the district court in the instant case relied on our statement in *Cherry I* that Cherry's consent to the second search was tainted by the violation of his *Miranda* rights. Under *Wong Sun v.*

*United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), if the search was so tainted, the evidence derived therefrom would be inadmissible at trial unless one of the exceptions to the exclusionary rule applied.[6] The district court applied one of these exceptions, the inevitable discovery exception, to hold the evidence admissible. Although the inevitable discovery exception has been recognized in varying forms by federal courts for over twenty years,[7] the Supreme Court for the first time invoked it as a basis for the admission of evidence only recently in *Nix v. Williams,* — U.S. ——, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984).

In *Williams,* Iowa police, based on facts uncovered in an ongoing police investigation, had reason to believe that the defendant was responsible for the disappearance of a 10-year-old girl from a YMCA building in Des Moines, Iowa. The police obtained a warrant for his arrest and at the same time initiated an intense search for the girl in the countryside between Des Moines and Grinnell, where the police surmised the defendant had left the girl or her body. The search party consisted of two hundred volunteers who were divided into teams of four to six persons each and directed to search specific grid areas. While the search was underway, the defendant surrendered to the authorities and, as a result of an illegal interrogation, directed the police to the child's body. At the time the search was called off, a search team was within two and one-half miles of the site where the body was found.

In considering whether the evidence of the body's location and condition was admissible as fruit of the illegal interrogation, the Supreme Court relied on the basic principles underlying the exclusionary rule and its exceptions. According to the Court, the "core rationale" of the rule is to deter police misconduct by ensuring that the prosecution is not put in a better position than it would have been in if no illegality had transpired. The high social cost of allowing obviously guilty persons to go unpunished, however, requires at the same time that the prosecution generally not be put in a *worse* position by the operation of the rule than it would have been in but for the constitutional violation. This latter notion, the Court argued, was the rationale behind the independent source doctrine and justified the recognition of an inevitable discovery exception as well. The Court held that, just as evidence that had been discovered by means wholly independent of any constitutional violation was admissible, when the information ultimately or inevitably would have been discovered by entirely lawful means, the exclusionary rule should not apply. In either case, reasoned the Court, the exclusion of evidence would fail to restore the parties to their previous positions and thus upset the careful weighing of competing interests underlying the exclusionary rule.[8]

With respect to the burden of proof, the Court held that, in order for otherwise

---

**6.** The government did not allege to the district court that the second search of Cherry's barracks and ceiling was authorized on any basis other than Cherry's consent.

**7.** *See, e.g., United States v. Fisher,* 700 F.2d 780 (2d Cir.1983); *United States v. Brookins,* 614 F.2d 1037 (5th Cir.1980); *Wayne v. United States,* 318 F.2d 205 (D.C.Cir.), *cert. denied,* 375 U.S. 860, 84 S.Ct. 125, 11 L.Ed.2d 86 (1963).

**8.** The Court also noted that under such circumstances suppression would not ensure the fairness of the trial or safeguard the adversary system of justice. The Court stated:

Fairness can be assured by placing the State and the accused in the same positions they would have been in had the impermissible conduct not taken place. However, if the government can prove that the evidence would have been obtained inevitably and, therefore, would have been admitted regardless of any overreaching by the police, there is no rational basis to keep that evidence from the jury in order to ensure the fairness of the trial proceedings. In that situation, the State has gained no advantage at trial and the defendant has suffered no prejudice. Indeed, suppression of the evidence would operate to undermine the adversary system by putting the State in a *worse* position than it would have occupied without any police misconduct. Williams' argument that inevitable discovery constitutes impermissible balancing of values is without merit.

104 S.Ct. at 2511.

tainted evidence to be admissible, the prosecution had to demonstrate the applicability of the inevitable discovery exception by a preponderance of the evidence. In so holding, the Court rejected the defendant's position that the burden should be clear and convincing evidence on the ground that "inevitable discovery involves no speculative elements but focuses on demonstrated historical facts capable of ready verification or impeachment." *Id.* at 2510 n. 5. Finally, turning to the facts of the case at hand, the Supreme Court noted that the child's body had been found near a culvert, one of the kinds of places the search teams had been specifically directed to search, and that at the suppression hearing testimony was introduced that the body would have been found within three to five hours if the search had not been called off. Based on the foregoing, the Court concluded that the discovery of the body was inevitable and thus the evidence was admissible under the inevitable discovery exception.

### B. *Fifth Circuit Precedent*

Although the Supreme Court in *Nix v. Williams* adopted the inevitable discovery exception to hold certain evidence admissible, no attempt was made in that case to define the contours of that exception. The Supreme Court especially provided no guidance as to what, beyond the specific facts of *Williams* itself, constitutes an "inevitable" discovery.[9] For this reason, we agree with the Eleventh Circuit that previous circuit caselaw, to the extent it is consistent with the principles enunciated in *Williams*, is still relevant authority in determining the applicability of the inevitable discovery exception to a particular set of facts. *See United States v. Satterfield,* 743 F.2d 827, 846 (11th Cir.1984).

In *United States v. Brookins,* 614 F.2d 1037 (5th Cir.1980), we set forth the prerequisites to the invocation of the inevitable discovery exception in this circuit. *Brookins* involved the admissibility of voluntary testimony of a witness, the identity of whom was obtained by means of an illegal interrogation. We held that, for the testimony to be admissible under the inevitable discovery exception, the prosecution had to demonstrate (1) a reasonable probability that the evidence in question would have been discovered by lawful means but for the police misconduct, (2) that the leads making the discovery inevitable were possessed by the police at the time of the misconduct, and (3) that the police also prior to the misconduct were actively pursuing the alternate line of investigation. *Id.* at 1042 n. 2; *see also United States v. Parker,* 722 F.2d 179, 185 n. 4 (5th Cir. 1983); *United States v. Shaw,* 701 F.2d 367, 379 n. 6 (5th Cir.1983), *cert. denied,* — U.S. ——, 104 S.Ct. 1419, 79 L.Ed.2d 744 (1984); *United States v. Satterfield,* 743 F.2d at 846–47; *United States v. Roper,* 681 F.2d 1354 (11th Cir.1982), *cert. denied,* 459 U.S. 1207, 103 S.Ct. 1197, 75 L.Ed.2d 440 (1983).

We find the three-prong test of *Brookins* to be fully consistent with *Nix v. Williams.* In *Williams,* the search was already underway in the general vicinity where the body was found when the police initiated the illegal interrogation. At the time of the police misconduct, therefore, the authorities were both actively pursuing the alternate line of investigation and in possession of a number of leads. As the Supreme Court noted, excluding the evidence under these circumstances would (1) put the prosecution in a worse position than it would have been in but for the police misconduct and (2) fail to be a significant deterrent since, if in the future the police are in a position to determine that the discovery of the evidence through independent means is imminent and inevitable, "there will be little to gain from taking any dubious 'shortcuts.' " *Id.* at 2510. In contrast, when the police have not been in active pursuit of an alternate line of investigation that is at a minimum supportable by leads, the general application of the inevitable discovery exception would greatly encourage the police to engage in illegal conduct

---

**9.** *See generally The Supreme Court, 1983 Term,* 98 Harv.L.Rev. 87, 129 (1984) (Supreme Court in *Williams* "failed to specify necessary criteria for determining 'inevitability' ").

because (1) the police would usually be less certain that the discovery of the evidence is "inevitable" in the absence of the illegal conduct and (2) the danger that the evidence illegally obtained may be inadmissible would be reduced. While suppression in such a case may put the prosecution in a worse position because of the police misconduct, a contrary result would cause the inevitable discovery exception to swallow the rule by allowing evidence otherwise tainted to be admitted merely because the police could have chosen to act differently and obtain the evidence by legal means. When the police forego legal means of investigation simply in order to obtain evidence in violation of a suspect's constitutional rights, the need to deter is paramount and requires application of the exclusionary rule. *See United States v. Satterfield*, 743 F.2d at 846 ("The Government cannot later initiate a lawful avenue of obtaining the evidence and then claim that it should be admitted because its discovery was inevitable."); *United States v. Alvarez-Porras*, 643 F.2d 54, 64 (2d Cir.) ("we will not risk the whittling down of the warrant requirement ... by justifying the admission of evidence under a broad inevitable-discovery exception"), *cert. denied*, 454 U.S. 839, 102 S.Ct. 146, 70 L.Ed.2d 121 (1981); *United States v. Griffin*, 502 F.2d 959, 961 (6th Cir.) ("police who believe they have probable cause to search cannot enter a home without a warrant merely because they plan subsequently to get one"), *cert.*

*denied*, 419 U.S. 1050, 95 S.Ct. 626, 42 L.Ed.2d 645 (1974).[10]

The integrity of the *Brookins* rule, and its compatibility with *Nix v. Williams*, are further demonstrated by the rule's exceptions. In *United States v. Miller*, 666 F.2d 991 (5th Cir.), *cert. denied*, 456 U.S. 964, 102 S.Ct. 2043, 72 L.Ed.2d 489 (1982), for example, we considered whether certain testimony obtained through the exploitation of an illegally seized diary was admissible on the ground that subsequent to the seizure the same evidence became available by means of a confession. Although the *Brookins* prerequisites were not met in that case, we held that the inevitable discovery exception applied since the alternate means for obtaining the evidence was an intervening and independent event occurring *subsequent* to the misconduct. *Id.* at 997. Under such circumstances, the interest in deterrence that gave rise to the *Brookins* rule is not so much implicated since the police at the time of the misconduct necessarily are not able to know that independent discovery of the evidence is inevitable and thus cannot rely on a broad application of the inevitable discovery rule to render admissible evidence actually obtained illegally.[11]

■ In sum, we hold that *Brookins* and its progeny still govern the application of the inevitable discovery exception in this circuit. In order for the exception to apply, the prosecution must demonstrate both a reasonable probability that the evidence

---

**10.** *See generally The Supreme Court, 1983 Term,* *supra* note 9, at 126. We find *Williams* generally supportive of our holding in *Brookins* for other reasons as well. First, the Supreme Court stated in *Williams* that the inevitable discovery exception "involves no speculative elements but focuses on demonstrated historical facts." 104 S.Ct. at 2510 n. 5. This comment implies that the alternate means of obtaining the evidence must at least be in existence and, at least to some degree, imminent, if yet unrealized. If the inevitable discovery exception can be applied only on the basis of the police officer's mere intention to use legal means subsequently, the focus of the inquiry would hardly be on historical fact. Second, *Brookins* itself was cited with approval in *Williams*. *See* 104 S.Ct. at 2507 n. 2.

**11.** *Miller*, in fact, is a more compelling case for the application of the inevitable discovery exception than is *Williams*. In *Williams*, the Supreme Court reasoned that the interest in deterrence was not significant since the police officer would not want to risk tainting evidence that was otherwise inevitably discoverable. The police officer in *Miller*, however, did not know that the discovery of the evidence was inevitable or at all possible apart from the misconduct and thus could only presume that all evidence obtained illegally would be excludable under the normal operation of the exclusionary rule. At any rate, the point is that in both cases the lack of interest in deterrence and the strong interest in ensuring that the prosecution is not put in a worse position because of the misconduct require the admission of the evidence.

would have been discovered in the absence of police misconduct and that the government was actively pursuing a substantial alternate line of investigation at the time of the constitutional violation. In certain circumstances, however, such as when the hypothetical independent source comes into being only after the misconduct, the absence of a strong deterrent interest may warrant the application of the inevitable discovery exception without a showing of active pursuit by the government in order to ensure that the government is not unjustifiably disadvantaged by the police misconduct.

### C. The Pistol, Bullets, and Pistol Case

█ The district court below held that the discovery of the .32 caliber pistol, the bullets, and the pistol case were inevitable because "as of December 8, 1982, FBI agents had more than enough probable cause to obtain a search warrant for Defendant's specific area of the barracks, and they had good and sufficient reason to make a specific search of the false ceiling where the gun was found." Record Vol. I, at 53. No finding was made, however, that

the agents were actively pursuing a warranted means of searching the ceiling at the time the misconduct occurred. In fact, uncontradicted testimony elicited at the second suppression hearing makes clear that, at the time Cherry's barracks and ceiling were searched for the second time, the agents had not even begun taking notes for the purpose of drafting an affidavit, a necessary prerequisite to the procurement of a warrant.[12] Thus, because at the time of the warrantless search the agents could have obtained a warrant but had made no effort to do so, we find under *Brookins* that the district court erred in holding the evidence admissible under the inevitable discovery exception.

The government on appeal makes the additional argument that, even if the known availability of a warranted entry does not by itself satisfy the requirements of the inevitable discovery exception, the agents at the time of the seizure were poised, relying entirely on investigatory leads gathered independently of Cherry's incriminating statements, to conduct a search of the ceiling of Cherry's barracks. According to the government, this alleg-

12. Agent Graham testified as follows:

Q. ... Who is it in your organization that had been given the order to prepare an affidavit for an application for a search warrant?
A. We had not begun an affidavit for a search warrant at [the point of the second search].
Q. I see. Did you make notes that you were going to put in that affidavit? Who was going to do it?
A. Had it have been done, it would probably have been special Agent Palacios.
Q. It possibly would have been him?
A. Yes.
Q. Had it been done.
A. Yes, sir.
Q. But it was not done.
A. No, sir.
Q. He was not even told to begin it. Right?
A. No, sir.
Q. Okay. Did anyone discuss with the Magistrate or any Judge the issuance of a search warrant?
A. No, sir. At that point, no.
Q. Do you know which judges were available to which you would have presented this application for a search warrant?
A. No, sir, I would not have presented it. Palacios probably would have.

Q. And you have no idea who the magistrates were that you had in mind?
A. No, I did not have any idea.
Q. You know for a fact, don't you, that Judges do not always approve applications for search warrants. You know that, don't you?
A. Yes, sir; I do.
Q. Okay. You cannot tell us today that had you presented an application for a search warrant to a Judge to search the ceiling that it would have been granted and that one would have been issued, can you?
A. No. Like I said, we would have attempted a search warrant.
Q. You can't tell us if it would have been issued, can you?
A. No, sir.
Q. You don't even know which judge it would have presented to, do you?
A. No.
Q. You don't even know what you would have put in the application, do you?
A. I would not have made the application. No.
Q. One was not even started, was it?
A. No, sir.
Q. Okay. No one in your organization had been given orders to start one?
A. No, sir.

edly imminent search would not have required a warrant since Cherry did not have a reasonable expectation of privacy in the space above his ceiling. Because an investigation was already being conducted that in the near future would have led to the discovery of the evidence independently of Cherry's statements, the government contends, the discovery of the pistol, the bullets, and the pistol case was inevitable.

█ Although we find no flaw in the government's argument on a theoretical level, it must ultimately be rejected on the ground that the government failed to carry the applicable burden of proof. In asserting that at the time of the second search the agents had independently been planning on conducting a search of Cherry's ceiling, the government explicitly acknowledges[13] that certain items of information obtained during the first search—specifically, the structure of the ceiling and the dusty footprint on Cherry's dresser—were most important in alerting the agents to the need for a second search. In his motion to suppress, however, Cherry alleged that his consent to both searches and all products thereof were tainted by his illegal arrest. It is firmly established that, once the defendant goes forward with specific evidence demonstrating taint, the government has the final burden of persuasion to show that the evidence is untainted. *Alderman v. United States,* 394 U.S. 165, 183, 89 S.Ct. 961, 972, 22 L.Ed.2d 176 (1969); *United States v. Webster,* 750 F.2d 307, 314 (5th Cir.1984); *see generally* 3 W. LaFave, *Search and Seizure* § 11.2 (1978). Cherry's allegations, together with the district court's conclusion that the arrest was in fact illegal, therefore suffice to create a prima facie case that the leads obtained during the first search and any subsequent evidence gathered through their use are tainted. This presumption has not been rebutted. Thus, insofar as we are left with

no choice but to deem as tainted the roots of the alternate investigative path and any evidence that would have been thereby obtained, we conclude that the government has not shown that the pistol, bullets, and pistol case would inevitably have been discovered by entirely lawful means, and the inevitable discovery exception cannot be applied.

### D. *The Fingerprint Evidence*

█ As noted above, in the course of their examination of the interior of the abandoned taxicab, FBI agents obtained a fingerprint that was later identified as belonging to Cherry. This identification was made by comparing the fingerprint found in the cab to the set of fingerprints taken from Cherry on December 8 after he confessed. Relying on *Davis v. Mississippi,* 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969),[14] Cherry before trial moved to suppress the set of fingerprints on the ground that it was obtained by the exploitation of his illegal arrest. The district court denied the motion, stating in part that "in view of the probable cause available from independent sources in this case, the Court finds that the Defendant would inevitably have been arrested on a charge of murder, and a set of fingerprints would have been obtained incident to this lawful arrest."[15] Record Vol. I, at 54. Cherry renews his challenge on appeal.

We find the fingerprints properly admitted under *United States v. Miller.* The advent of an independent basis of probable cause relied upon by the district court would have necessarily occurred subsequent to Cherry's illegal arrest and detention on December 7. Because the hypothetical independent source for the evidence could have only been used after the police misconduct, the government was not required to show active pursuit or the possession of leads under *Brookins.* We

---

**13.** *See* Appellee's Brief at 26. The government made similar statements during oral argument.

**14.** *See also Hayes v. Florida,* —— U.S. ——, 105 S.Ct. 1643, 84 L.Ed.2d 705 (1985).

**15.** The district court also based its holding on the availability of Cherry's fingerprints from army records. Because we hold that Cherry's inevitable arrest alone justifies the application of the inevitable discovery exception, we need not consider this part of the district court's opinion.

agree with the district court that Cherry eventually would have been lawfully arrested and fingerprinted but for the fourth amendment violation,[16] and we therefore uphold the ruling of the district court in this regard. *See United States v. De Simone,* 660 F.2d 532, 542 (5th Cir.1981), *cert. denied,* 455 U.S. 1027, 102 S.Ct. 1732, 72 L.Ed.2d 149 (1982); *United States v. Rowell,* 612 F.2d 1176, 1179 (7th Cir.1980); *United States v. Jarvis,* 560 F.2d 494, 498 (2d Cir.1977), *cert. denied,* 435 U.S. 934, 98 S.Ct. 1511, 55 L.Ed.2d 532 (1978).

### III. CHERRY'S CONSENT TO THE SECOND SEARCH

#### A. *Fruit of Miranda*

■ At the suppression hearing before Cherry's second trial, the sole basis the government asserted for the admission of the pistol, bullets, and pistol case discovered above Cherry's ceiling was the inevitable discovery exception to the exclusionary rule. This may have been so because in *Cherry I* we stated that Cherry's consent to the second search "was the unlawful product of the government's inquiry regarding the gun." 733 F.2d at 1132 n. 15. On remand, this statement—clearly implying that Cherry's consent was tainted as the "fruit" of the *Miranda* violation—became the law of the case and prevented the parties from reconsidering the effect of the consent apart from that taint. Similarly, since the second search was clearly conducted in response to Cherry's description of the location of the evidence supplied immediately following the *Miranda* violation, the application of the fruit of the poisonous tree doctrine to the *Miranda* violation no doubt discouraged the parties

from arguing that consent was not needed to perfect the search. On appeal, the government for the first time defends the district court's admission of the pistol and other items on the additional ground that, contrary to our statement in *Cherry I,* the search of the ceiling above Cherry's barracks was (1) not tainted by the *Miranda* violation and (2) conducted pursuant to Cherry's valid consent under the fourth amendment. Although it is our practice to treat as conclusive the prior determinations by this court of issues presented in earlier appeals of the same case, we have stated that such a rule is not an inexorable command and should not be followed when " 'controlling authority has since made a contrary decision of the law applicable to such issues.' " *Daly v. Sprague,* 742 F.2d 896, 900 (5th Cir.1984) (quoting *White v. Murtha,* 377 F.2d 428, 431–32 (5th Cir. 1967)); *see also United States v. McClain,* 593 F.2d 658, 664 (5th Cir.), *cert. denied,* 444 U.S. 918, 100 S.Ct. 234, 62 L.Ed.2d 173 (1979). Because we find that, in light of the recent Supreme Court case of *Oregon v. Elstad,* —— U.S. ——, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), our statement in *Cherry I* no longer reflects the current state of the law, we are compelled at this juncture to reconsider the validity of Cherry's consent to the second search under both the fourth and the fifth amendments and remand for appropriate findings of fact and conclusions of law.[17]

■ *Oregon v. Elstad* concerned whether a confession made after the police gave a suspect proper *Miranda* warnings is inadmissible on the ground that the police had earlier obtained an unwarned admission from the suspect. In considering

---

**16.** By the time Cherry was brought before a magistrate, the FBI agents had uncovered the following facts independently of prior misconduct: (1)· Cherry's military identification and driver's license was in the victim's abandoned taxicab; (2) the taxicab's last dispatch was to Cherry's barracks at Fort Bliss; (3) the victim's wallet had been left in a trash receptacle in the latrine area in Cherry's barracks; and (4) members of Cherry's unit had seen him recently in possession of a .32 caliber pistol. We think that the laminated total of this information amounts to probable cause and that the district court's finding that the agents eventually would have acted upon the probable cause to arrest Cherry

is not clearly erroneous. *See United States v. Webster,* 750 F.2d at 314; *United States v. Jonas,* 639 F.2d 200, 204 (5th Cir.1981); *United States v. Gunn,* 428 F.2d 1057, 1060 (5th Cir.1970).

**17.** Similarly, we consider the government's assertions although raised for the first time on appeal because our refusal to do so would result in manifest injustice. *See United States v. Parker,* 722 F.2d 179, 183 (5th Cir.1983); *United States v. Davis,* 656 F.2d 153, 155–56 (5th Cir. 1981), *cert. denied,* 456 U.S. 930, 102 S.Ct. 1979, 72 L.Ed.2d 446 (1982).

the issue with respect to the fruit of the poisonous tree doctrine,[18] the Supreme Court initially noted that a violation of *Miranda* is not a violation of the fifth amendment itself. Rather, *Miranda* established a nonconstitutional prophylactic rule, the violation of which creates an irrebutable presumption of coercion that is applicable in only a limited number of circumstances. For instance, while the presumption requires suppression of unwarned statements for purposes of the prosecution's case-in-chief, the presumption does not bar introduction of the incriminating statements for impeachment purposes on cross-examination.[19] When an unwarned statement is used in situations where the presumption does not apply, "the primary criterion of admissibility [remains] the 'old' due process voluntary test." *Id.* at ——, 105 S.Ct. at 1293 (citations & quotations omitted). Based on the foregoing and relying heavily on *Michigan v. Tucker*, 417 U.S. 433, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974), the Court then held that, where there is no actual

infringement of a suspect's constitutional rights, mere departures from the *Miranda* rule did not require the exclusion of derivative evidence.[20] This principle was stated to be applicable regardless of whether the alleged fruit of a noncoercive *Miranda* violation is an article of evidence or the accused's own voluntary testimony. Said the Court:

> Because *Miranda* warnings may inhibit persons from giving information, this Court has determined that they need be administered only after the person is taken into "custody" or his freedom has otherwise been significantly restrained. *Miranda v. Arizona*, 384 U.S., at 478 [86 S.Ct., at 1630]. Unfortunately, the task of defining "custody" is a slippery one, and "policemen investigating serious crimes [cannot realistically be expected to] make no errors whatsoever." *Michigan v. Tucker, supra,* [417 U.S.,] at 446 [94 S.Ct., at 2364]. If errors are made by law enforcement officers in adminis-

---

**18.** In the latter part of the majority opinion, the Court also considered whether the prior *Miranda* violation compromised the actual voluntariness of the later confession in a constitutional sense. —— U.S. at —— – ——, 105 S.Ct. at 1292–96. The Court found the alleged psychological impact of the prior unwarned admissions "speculative and attenuated at best." *Id.* at ——, 105 S.Ct. at 1296.

**19.** *See Harris v. New York,* 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971).

**20.** The Court characterized *Michigan v. Tucker* as having already held that a violation of *Miranda* is not a basis for the suppression of derivative physical evidence. The Court stated:

> In *Michigan v. Tucker,* 417 U.S. 433 [94 S.Ct. 2357, 41 L.Ed.2d 182] (1974), the Court was asked to extend the *Wong Sun* fruits doctrine to suppress the testimony of a witness for the prosecution whose identity was discovered as the result of a statement taken from the accused without benefit of full *Miranda* warnings. As in respondent's case, the breach of the *Miranda* procedures in *Tucker* involved no actual compulsion. The Court concluded that the unwarned questioning "did not abridge respondent's constitutional privilege ... but departed only from the prophylactic standards later laid down by this Court in *Miranda* to safeguard that privilege." 417 U.S., at 446 [94 S.Ct., at 2364]. *Since there was no actual infringement of the suspect's constitutional rights, the case was not controlled by the doctrine expressed in* Wong Sun

*that fruits of a constitutional violation must be suppressed.* In deciding "how sweeping the judicially imposed consequences" of a failure to administer *Miranda* should be, 417 U.S., at 445 [94 S.Ct., at 2364], the *Tucker* Court noted that neither the general goal of deterring improper police conduct nor the general goal of deterring improper police conduct nor the Fifth Amendment goal of assuring trustworthy evidence would be served by suppression of the witness' testimony. The unwarned confession must, of course, be suppressed, but the Court ruled that introduction of the third-party witness' testimony did not violate Tucker's Fifth Amendment rights.

We believe that this reasoning applies with equal force when the alleged "fruit" of a noncoercive *Miranda* violation is neither a witness nor an article of evidence but the accused's own voluntary testimony. *Id.* at ——, 105 S.Ct. at 1293 (emphasis supplied). In his dissent, Justice Brennan argued that *Tucker* was distinguishable since the interrogation in that case occurred before the *Miranda* decision was announced and was conducted in an objectively reasonable manner. According to Justice Brennan, the derivative-evidence rule was not applied in *Tucker* because "the exclusion of the derivative evidence solely for failure to comply with the then-nonexistent *Miranda* requirement would not significantly deter future *Miranda* violations. As the Court noted, the 'deterrence rationale loses much of its force' when there is nothing to deter. 417 U.S., at 447 [94 S.Ct., at 2365]." *Id.* at ——, 105 S.Ct. at 1318 (Brennan, J., dissenting).

tering the prophylactic *Miranda* procedures, they should not breed the same irremediable consequences as police infringement of the Fifth Amendment itself. It is an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period. Though *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made.

*Id.* at ——, 105 S.Ct. at 1292.

■ Our statement in *Cherry I* that Cherry's consent to the second search was the tainted product of the violation of his *Miranda* rights does not survive the Supreme Court's holding in *Elstad*. While Cherry's confession and other incriminating statements remain inadmissible under the prophylactic rule, the validity of Cherry's consent and the admissibility of the derivative evidence depend solely on whether they are the product of an actual violation of a constitutional right. With respect to the fourth amendment, the government asserts that Cherry's consent was voluntary and not causally related to Cherry's initial illegal arrest. We discuss this argument *infra* and remand for appropriate fact findings. With respect to the fifth amendment, the government is silent, perhaps in reliance on the district court's finding at the first suppression hearing that Cherry's incriminating statements were voluntary and thus not violative of the fifth amendment.[21] However, because the district court did not adopt or even refer to this finding at the second suppression hearing, we also remand the issue whether Cherry's description of the location of the pistol or confession were violative of the

fifth amendment. If the district court finds such a violation, it must then determine whether the violation tainted the subsequent consent or, if consent was unnecessary, whether the violation otherwise tainted the evidence found in Cherry's ceiling.[22]

**B.** *The Illegal Arrest*

■ In arguing that Cherry's consent to the search of the ceiling above his barracks was voluntary under the fourth amendment, the government relies principally on *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), and *United States v. Mendenhall*, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). In these cases, the Supreme Court held that the voluntariness of a consent to search "is to be determined by the totality of all the circumstances." *Mendenhall*, 446 U.S. at 557, 100 S.Ct. at 1879. Neither of these cases, however, dealt with a situation in which the consent at issue was made subsequent to an illegal arrest. We have held that under these circumstances the fruit of the poisonous tree doctrine applies and therefore "voluntariness is merely a threshold requirement." *United States v. Robinson*, 625 F.2d 1211, 1220 (5th Cir. 1980); *see also Taylor v. Alabama*, 457 U.S. 687, 690, 102 S.Ct. 2664, 2668, 73 L.Ed.2d 314 (1982); *Dunaway v. New York*, 442 U.S. 200, 217, 99 S.Ct. 2248, 2259, 60 L.Ed.2d 824 (1979). Moreover, it is well established in this circuit that, in attempting to prove voluntary consent following an illegal arrest, the government bears a heavier burden than when consent is given after a legal arrest. *United States v. Melendez-Gonzalez*, 727 F.2d 407, 414 (5th Cir.1984); *United States v. Ballard*, 573 F.2d 913, 916 (5th Cir.1978); *United States v. Jones*, 475 F.2d 723, 730 (5th Cir.), *cert. denied*, 414 U.S. 841, 94 S.Ct. 96, 38 L.Ed.2d 77 (1973).

■ Under the fruit of the poisonous tree doctrine, in addition to proving volun-

---

**21.** Record Vol. I, at 168.

**22.** *See generally Murphy v. Waterfront Comm'n*, 378 U.S. 52, 79, 84 S.Ct. 1594, 1609, 12 L.Ed.2d 678 (1964).

tariness, the government must show a sufficient break in events to undermine the inference that the consent to search was caused by the fourth amendment violation. *Oregon v. Elstad,* —— U.S. at ——, 105 S.Ct. at 1292. The focus on the causal connection between the illegality and the consent serves the policies and interests of the fourth amendment because, when the causal connection is close, "not only is exclusion of the evidence more likely to deter similar police misconduct in the future, but also use of the evidence is more likely to compromise the integrity of the courts." *Dunaway,* 442 U.S. at 218, 99 S.Ct. at 2259; *see also Taylor v. Alabama,* 457 U.S. at 690, 102 S.Ct. at 2667; *Brown v. Illinois,* 422 U.S. 590, 599, 95 S.Ct. 2254, 2259, 45 L.Ed.2d 416 (1975). The Supreme Court, however, has consistently refused to adopt a "per se" or "but for" rule that would render inadmissible any evidence obtained through a chain of causation with the illegal arrest; rather, whether the link between the illegality and the evidence requires the application of the exclusionary rule must be determined by balancing the rule's policies with "'the strong interest ... of making available to the trier of fact all concededly relevant and trustworthy evidence which either party seeks to adduce.'" *United States v. Ceccolini,* 435 U.S. 268, 278, 98 S.Ct. 1054, 1061, 55 L.Ed.2d 268 (1978) (quoting *Michigan v. Tucker,* 417 U.S. at 450–51, 94 S.Ct. at 2367).

In *Brown v. Illinois,* the Supreme Court identified several factors to be considered in determining whether a consent to search was obtained by exploitation of the illegal seizure: (1) "[t]he temporal proximity of the arrest and the [consent]," (2) "the presence of intervening circumstances," and (3) "the purpose and flagrancy of the official misconduct." 422 U.S. at 603–04, 95 S.Ct.

at 2261–62; *see also Dunaway,* 442 U.S. at 218, 99 S.Ct. at 2259. The relative importance of each of these factors in any particular case of course depends on the circumstances of that case. When the challenged item is the result of a volitional act, for example, often the primary criterion is whether the act was sufficiently one of free will to purge the primary taint. *See Rawlings v. Kentucky,* 448 U.S. 98, 108–09, 100 S.Ct. 2556, 2563, 65 L.Ed.2d 633 (1980); *United States v. Ceccolini,* 435 U.S. at 276–78, 98 S.Ct. at 1060–61. Even in such cases, however, attenuation analysis must take into account all facts that have some impact on the strengths of the respective interests. *See Rawlings v. Kentucky,* 448 U.S. at 108–09, 100 S.Ct. at 2563; 3 W. Lafave, *Search and Seizure* § 11.4(a) (1978); J. Hall, *Search & Seizure* § 22:2–:3 (1982).

■ At oral argument, the government suggested that, because at least by the time Cherry consented to the second search probable cause existed for his detention, attenuation analysis need not be applied to the facts of this case. Citing the Third Circuit case of *United States ex rel. Wright v. Cuyler,* 563 F.2d 627 (3d Cir. 1977), in support of its claim, the government apparently argues that the intervening advent of probable cause for Cherry's detention was per se sufficient to render the consent free from taint.[23] This argument is without merit. The acquiring of probable cause by the police between an illegal arrest and a suspect's consent to search neither logically breaks the causal chain between the two as a matter of course nor in view of the purposes of the exclusionary rule necessarily attenuates that relation to the point that the evidence need not be excluded. As we have seen, the theory underlying the fruit of the poisonous tree doctrine is that, when there is a close causal connection between the prior

---

**23.** *See also Townsley v. State,* 652 S.W.2d 791, 797 (Tex.Crim.App.1983) (apparently adopting a per se rule that incriminating statements made after an illegal arrest but while in lawful custody are not tainted).

Actually, it is unclear whether the Third Circuit in *United States ex rel. Wright v. Cuyler* adopted the per se rule advocated by the govern-

ment in the instant case. While the court in *Cuyler* clearly relied heavily on the intervening acquisition of probable cause in ruling that the subsequent confession was purged of taint, the court also noted that the state's initial illegal arrest of the suspect was not flagrantly improper "because the question of probable cause ... is indeed a close one." 563 F.2d at 631.

police misconduct and the availability of the challenged evidence, the evidence should be suppressed since the deterrent value of exclusion outweighs the competing interest in having all probative evidence put before the factfinder. If a suspect's consent to search following an illegal arrest were to be free from taint merely because at the moment of consent his detention was lawful, regardless of the egregiousness of the fourth amendment violation or its role in obtaining the consent, arrests made without probable cause would be encouraged, especially in those cases where the police have strong reason to believe that they will obtain probable cause at some point in the investigation independently of the unlawful detention. The intervening discovery of probable cause to support a suspect's detention, by itself, "cannot assure in every case that the Fourth Amendment violation has not been unduly exploited." *Brown v. Illinois*, 422 U.S. at 603, 95 S.Ct. at 2261.

Yet, while we decline to hold that the curing of an illegal arrest purges the taint of a subsequent consent as a matter of law, we think that the intervening acquisition of probable cause is an important attenuating factor in the analysis. To the extent that a suspect's consent to search is attributable to his lawful detention and not the prior illegal arrest, the causal connection between the initial illegality and the consent is weakened. As a result, the balance of competing interests underlying the exclusionary rule correspondingly tips in favor of a finding of attenuation and the admission of the derivative evidence. *See United States v. Manuel*, 706 F.2d 908, 911–12 (9th Cir.1983) (treating advent of probable cause as one intervening factor in attenuation analysis); *United States v. Nooks*, 446 F.2d 1283, 1287–88 (5th Cir.) (same), *cert. denied*, 404 U.S. 945, 92 S.Ct. 299, 30 L.Ed.2d 261 (1971); *cf. Johnson v. Louisiana*, 406 U.S. 356, 92 S.Ct. 1620, 32 L.Ed.2d 152 (1972) (taint purged from lineup following illegal arrest because of intervening

hearing before magistrate at which suspect was advised of rights and the alleged arrest was converted into lawful detention).[24]

Because the validity of a consent to search obtained by the police subsequent to an illegal arrest is an issue that must be resolved in the first instance by the district court, *see United States v. Robinson*, 625 F.2d at 1220; *United States v. Wilson*, 569 F.2d 392, 397 (5th Cir.1978), we vacate the judgment of the district court and remand the issue, along with the fifth amendment issue described above, to the district court for complete findings and conclusions under the appropriate standards. If the district court determines that Cherry's consent to the second search was voluntary within the meaning of the fourth amendment and untainted by Cherry's prior illegal arrest or by a violation of the fifth amendment, the judgment must be reinstated. If the district court finds otherwise, it must suppress the evidence and discharge the defendant.

## IV.   CONCLUSION

For the reasons stated above, we agree with the district court that Cherry's fingerprint evidence was admissible at trial under the inevitable discovery exception to the exclusionary rule. We hold, however, that the district court erred in ruling that the .32 caliber pistol, the bullets, and the pistol case were similarly admissible. Because as a result of recent Supreme Court caselaw our statement in *Cherry I* implying that Cherry's second consent to search was tainted by the *Miranda* violation can no longer be considered controlling, we remand the case for the district court to consider the admissibility of the evidence under the fourth and fifth amendments and the derivative-evidence rule as described herein.

VACATED AND REMANDED.

Record Vol. VI, at 17–18.

---

**24.**   *Taylor v. Alabama, supra,* is not inconsistent with our holding above. In *Taylor,* while the filing of an arrest warrant after the suspect's illegal arrest did not purge the subsequent con-

fession of taint, the warrant was issued based on evidence that was itself tainted by the arrest. 457 U.S. at 693, 102 S.Ct. at 2669.

ON PETITION FOR REHEARING

Before RANDALL, JOHNSON and GAR-WOOD, Circuit Judges.

PER CURIAM:

IT IS ORDERED that the petition for rehearing filed in the above entitled and numbered cause be and the same is hereby denied. If the district court on remand finds that the judgment cannot be reinstated, the government of course is entitled to retry Cherry. *See United States v. Scott,* 437 U.S. 82, 90–91, 98 S.Ct. 2187, 2193–94, 57 L.Ed.2d 65 (1978).