**UNITED STATES of America,**

v.

**Mohammed Khalil GHALI (01).**

**No. 3:03–CR–0212–M.**

United States District Court,
N.D. Texas,
Dallas Division.

April 2, 2004.

Joseph M. Revesz, U.S. Attorney's Office, Dallas, TX, for the United States.

Frank H. Jackson, Law Office of Frank Jackson, Dallas, TX, for Defendant Mohammed Ghali.

## *MEMORANDUM OPINION AND ORDER*

LYNN, District Judge.

On March 16, 2004, and continuing during trial, at which the Defendant Mohammed Ghali and the Government waived their right to trial by jury, under Fed. R. Cr. P. 23, the Court heard testimony and argument on a Motion to Suppress filed by Defendant Mohammed Ghali. The Court finds that Defendant has standing to challenge the Government's warrantless searches. However, because the Court finds that the Government would have inevitably discovered the contested evidence and that the addressee of the shipments at issue impliedly consented to the Government's searches, Defendant's Motion to Suppress is DENIED.

## BACKGROUND

On December 17, 2003, Defendant Mohammed Ghali was indicted on multiple counts related to an alleged conspiracy between Defendant and others involving the receipt, sale, and interstate transportation of stolen goods. Defendant's Motion to Suppress is directed to warrantless searches conducted in early 2003 by the Government at a Federal Express ("FedEx") facility in Irving, Texas, of packages sent by Sunshine Wholesale. Sunshine Wholesale is an unincorporated business enterprise for which Defendant's wife, Ste-

phanie Ghali, paid taxes and filed doing business certificates, but Defendant apparently managed the business.

The May 2003 affidavit of Bureau of Immigration and Customs Enforcement Agent Scott Springer, and live testimony and evidence establish the following. From late January through March 24, 2003, FedEx employees at the Irving, Texas facility contacted the U.S. Customs Service regarding packages that had been dropped off at FedEx by individuals employed by Sunshine Wholesale.[1] The packages were to be shipped to Power Supply and E–Medico, companies owned by Mirco Vietti in Pompano Beach, Florida. Vietti paid the freight costs for some of the shipments. The Government maintains that Vietti was cooperating with the Government at all times relevant to this case. The FedEx employees did not open any of the packages.

On at least five occasions from late January through March 24, 2003, U.S. Customs Service[2] agents, and a Fort Worth police officer working as part of a federal task force, visited the FedEx facility and, along with FedEx employees, conducted a search of the packages from Sunshine Wholesale. The searches were conducted without warrants. Agent Springer testified that he did not believe warrants were necessary, and FedEx was also of that view. The federal and state officials opened the packages and discovered in the shipments products that had been previously marked, represented as stolen, and sold to members of the alleged conspiracy by government operatives. The agents did not seize the shipments at that time; rather, they resealed the packages and allowed them to be shipped to Vietti. With Vietti's specific consent, the Government seized the shipments after they were delivered to Vietti.

Defendant moves to suppress the evidence obtained during the Government's searches of the FedEx shipments on the grounds that the searches violated the Fourth Amendment because they were conducted without warrants and without probable cause. The Government counters that Defendant lacks standing to challenge the constitutionality of the searches. Alternatively, the Government argues that even if Defendant had standing, the searches were constitutional because (a) FedEx possessed a right of inspection, which it either delegated to the Government agents or which permitted FedEx to consent, as it did, to the Government's searches; (b) the Government would have inevitably discovered the evidence; and (c) Vietti impliedly consented to the searches.

## ANALYSIS

### A. *Standing:*

The Government contends that Defendant lacks standing to challenge the constitutionality of the searches of Sunshine Wholesale's shipments through FedEx.

The Fourth Amendment protects individuals from unreasonable searches and seizures that intrude on reasonable

1. FedEx and the U.S. Customs Service had reached an apparent understanding that FedEx would contact the Customs Service if it received any shipments from Sunshine Wholesale. According to C.L. Bergeron, a FedEx security manager, FedEx had initiated contact with the Customs Service in early 2003, because FedEx employees, including Bergeron, were concerned that a May 6, 2002 shipment by Sunshine Wholesale of baby formula looked odd and might constitute stolen goods.

2. Special agents of the U.S. Customs Service are now part of the U.S. Department of Homeland Security's Bureau of Immigration and Customs Enforcement. For simplicity's sake, the Court will refer to both entities as the "Customs Service."

expectations of privacy. Warrantless searches are presumptively unreasonable. *U.S. v. Villarreal,* 963 F.2d 770, 773 (5th Cir.1992) (citing *Horton v. California,* 496 U.S. 128, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990)). However, a defendant may not claim rights under the Fourth Amendment vicariously; rather, the defendant bears the burden of establishing his standing to challenge a search or seizure under the Fourth Amendment. *Rakas v. Illinois,* 439 U.S. 128, 130 n. 1, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). In order to establish standing, the defendant must show that he had a legitimate expectation of privacy in the object searched or seized. *Rawlings v. Kentucky,* 448 U.S. 98, 104, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980). The Fifth Circuit has explained:

> Individuals do not surrender their expectations of privacy in closed containers when they send them by mail or common carrier. The Supreme Court has long recognized that "[l]etters and other sealed packages are in the general class of effects in which the public at large has a legitimate expectation of privacy." *United States v. Jacobsen,* 466 U.S. 109, 104 S.Ct. 1652, 1657, 80 L.Ed.2d 85 (1984); *United States v. Van Leeuwen,* 397 U.S. 249, 251, 90 S.Ct. 1029, 1031, 25 L.Ed.2d 282 (1970); *Ex Parte Jackson,* 96 U.S. 727, 733, 24 L.Ed. 877 (1877). Both senders and addressees of packages or other closed containers can reasonably expect that the government will not open them. *Villarreal,* 963 F.2d at 774–75.

In *Villarreal,* the Court of Appeals affirmed the district court's granting the defendants' motion to suppress. U.S. Customs agents obtained the evidence during a search conducted after common carrier employees contacted Customs agents about two suspicious fifty-five gallon drums. After being charged with possessing and conspiring to distribute marijuana seized during the search, the intended recipients of the fifty-five gallon drums moved to suppress the evidence. The Government argued that the intended recipients did not have a reasonable expectation of privacy in the drums. Relying on the Supreme Court's decisions in *Jacobsen* and *Ex Parte Jackson,* the Fifth Circuit stated, "The drum opened by the customs agent in this case was a closed container sent by a common carrier in which the sender and addressee had a reasonable expectation of privacy," and held that the defendants, as addressees, had a reasonable expectation of privacy in the shipments. *Id.* at 774.

The Fifth Circuit's analysis in *Villarreal* establishes that when a party is a sender or addressee of a package, he or she presumptively possesses a legitimate expectation of privacy in the contents of the package. Thus, generally in such a case, the Court need not undertake the traditional analysis, set forth in *California v. Ciraolo,* 476 U.S. 207, 211, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986), to determine whether the individual challenging the investigative activity had a subjective expectation of privacy and whether society was prepared to recognize that expectation of privacy as objectively reasonable. There is no evidence here to overcome the presumption. Thus, the shipper had a reasonable expectation of privacy in the shipment.

The Government contends that the Defendant lacks standing because the shipper relinquished its property interest in the shipments when the packages were delivered to FedEx. In support of its position, the Government relies on Texas property law, which establishes that in the absence of an agreement to the contrary, delivery by a seller of goods to a common carrier constitutes delivery to the buyer. *Central Freight Lines, Inc. v. Clarke & Courts, Inc.,* 413 S.W.2d 927, 929 (Tex.Civ.

App.—Texarkana 1967, writ ref'd n.r.e.); *see also* TEX. BUS. & COM. CODE ANN. § 2.401(b) (Vernon 2003). According to the Government, title passed to Vietti when the property was delivered to FedEx, and therefore, Defendant lacked an expectation of privacy in the shipments when they were searched. The Court finds this argument unpersuasive. While property rights may be useful in guiding a court's inquiry as to whether a legitimate expectation of privacy exists, property rights based on concepts of title and risk of loss are not necessarily determinative of standing. Relying on *Jacobsen* and *Ex Parte Jackson,* the Fifth Circuit in *Villarreal* held that both a sender and an addressee of a package tendered to a common carrier have a legitimate expectation of privacy in the package. *Villarreal,* 963 F.2d at 775. Nothing in *Villarreal* suggests that this expectation was tied to the technical ownership by the sender or addressee. Thus, in order to establish his standing to challenge the Government's warrantless searches, it is sufficient that Defendant show that he was the sender of the packages.

The bills of lading show that the shipments at issue were sent by Sunshine Wholesale. While the Government alleges in the indictment that Defendant controlled Sunshine Wholesale, and the Government has offered evidence to prove as much, it contends for purposes of Defendant's Motion to Suppress that Defendant's connection to Sunshine Wholesale is too tenuous to support his standing to challenge the Government's warrantless searches of property sent by Sunshine Wholesale. The evidence offered by the Government shows that Defendant's wife, Stephanie Ghali, paid taxes and filed an assumed name certificate on behalf of Sunshine Wholesale, but that Defendant actually ran the business of Sunshine Wholesale. Further, in a community property state such as Texas, a spouse is presumed to have an ownership interest in any business enterprise possessed by his or her spouse during the marriage. *See* TEX. FAM. CODE ANN. § 3.003 ("Property possessed by either spouse during or on dissolution of marriage is presumed to be community property"); *see also Bantuelle v. Bantuelle,* 195 S.W.2d 686, 689 (Tex.Civ.App.—Texarkana 1946, no writ) ("[A]ll the rents, profits, earnings and other revenues received from all realty and business enterprises during the marriage became the community property of this couple."). Here, there is no evidence to rebut the presumption that Defendant had an ownership interest in Sunshine Wholesale. The Court is of the opinion the evidence that Defendant in fact controlled Sunshine Wholesale and the Defendant's legal interest in the business arising from his marriage is sufficient to give Defendant standing under the Fourth Amendment to challenge searches of packages sent by Sunshine Wholesale. The Court finds that Defendant is effectively the sender, that he had a legitimate expectation of privacy in the packages, and that he thus has standing to challenge the searches.

**B. *Right of Inspection***

**1. Common Law Right of Inspection**

Based on a common carrier's common law right to inspect packages accepted for delivery, the Government argues that FedEx retained the right to inspect the packages and that FedEx could consent to the Government's searches or delegate its inspection right to the Government.

Defendant contends that in this case, FedEx did not possess a delegable right to inspect, maintaining that placing a package with a common carrier does not forfeit a person's right to privacy in the package.

*See Corngold v. U.S.,* 367 F.2d 1, 7 (9th Cir.1966).

The Supreme Court has recognized that "[c]ommon carriers have a common law right to inspect packages they accept for shipment, based on their duty to refrain from carrying contraband." *Illinois v. Andreas,* 463 U.S. 765, 769 n. 1, 103 S.Ct. 3319, 77 L.Ed.2d 1003 (1983) (citing *U.S. v. Pryba,* 502 F.2d 391, 399–400 (D.C.Cir.1974)). In *U.S. v. Pryba,* the D.C. Circuit elaborated on this inspection right:

> It is rooted in the common law that common carriers have the right to decline shipment of packages proffered in certain circumstances indicating contents of a suspicious, indeed of a possibly dangerous nature. Justification for the carrier's refusal is to be found in the exigencies of safeguarding life and property, and undeniably the frustration of criminality is likewise a worthy carrier endeavor. The imperatives of either objective may warrant inquiry by the carrier as to the contents of a parcel tendered for shipment; they may suffice, too, to justify a reasonable inspection of the parcel to fulfill that purpose. *Id.* at 399 (internal citations omitted).

While this right allows a common carrier to inspect suspicious shipments, the right is not unlimited, nor is it delegable to the government without restriction. As the Fifth Circuit made clear in *Villarreal,* senders and addressees of packages have a reasonable expectation that the government will not open them. *Villarreal,* 963 F.2d at 775. In a footnote in *Andreas,* the Supreme Court noted the common carrier's right to conduct a *private* search. *Andreas,* 463 U.S. at 769 n. 2, 103 S.Ct. 3319. The Court commented as follows:

> When common carriers discover contraband in packages entrusted to their care, it is routine for them to notify the appropriate authorities. The arrival of police on the scene to confirm the presence of contraband ... does not convert the private search by the carrier into a government search subject to the Fourth Amendment. *Id.*

In other words, the Court recognized that involvement of the police is permissible, when it occurs after the carrier, in the exercise of its own right to inspect suspicious packages, finds contraband. Here, the carrier did not inspect. It deferred to the Government the inspection of all packages, whether they appeared suspicious or not, merely because they came from Sunshine Wholesale. *Andreas* does not authorize that.

In support of its position that FedEx's inspection rights permitted it to consent to the Government's warrantless searches, the Government relies on *U.S. v. Blum,* 329 F.2d 49 (2d Cir.1964), and *U.S. v. Averell,* 296 F.Supp. 1004 (E.D.N.Y.1969).

In *Blum,* the Second Circuit upheld a warrantless search where Railway Express Air Division ("REA"), a common carrier, permitted U.S. Customs to open a package labeled "cutlery" that had tested positive for radioactive material. 329 F.2d at 50. In holding that U.S. Custom's subsequent search of the package did not constitute a violation of the Fourth Amendment, the court explained that REA had a right to open and inspect the package because its contents had been misdeclared. *Id.* at 52.

*Blum* is distinguishable from the present case because there the common carrier had specific confirmation that the package in question was mislabeled. It clearly was not obligated to ship something other than what the shipper had represented it was delivering to the carrier. Such mislabeling triggered the carrier's interest in determining what was actually in the package, to confirm that it was not dangerous or illegal. Similar circumstances do not exist

here. FedEx security manager Bergeron testified that the only suspicious aspect of the 2003 shipments in issue was that Sunshine Wholesale had delivered them. While FedEx may have been suspicious of Sunshine Wholesale based on the odd appearance of its May 6, 2002 shipment of baby formula, this suspicion was insufficient to permit FedEx to initiate an open-ended consent to inspection by the U.S. Customs Service of all packages from Sunshine Wholesale.

In *Averell,* the suspicions of Trans Caribbean Airlines ("TCA"), a common carrier located at John F. Kennedy Airport, were aroused when the persons who brought the shipment to TCA lingered in the parking area before tendering the shipment, and, upon doing so, refused to provide a local address. The airway bill stated that the shipment contained sewing machine parts, yet TCA employees could see reddish hair along one side of one of the packages and the packages did not seem heavy enough to be loaded with machine parts. TCA employees contacted FBI and local police officers, opened one of the packages, and discovered that it contained a shipment of wigs. The next day, FBI agents opened the remaining packages in front of TCA supervisors, and discovered that they, too, contained wigs. In holding that the FBI's warrantless search of the remaining packages was constitutionally permissible, the court relied on the express authorization in TCA's tariff provision, which stated that "[s]hipments shall be subject to inspection by the carrier," and on TCA's request to the FBI to determine whether the wigs were stolen. Key to the court's decision was the fact that TCA enlisted the FBI's participation in the investigation and that the investigation involved issues of interest to TCA. *Id.* at 1010–11. As in *Blum,* the carrier had a specific articulable basis for concluding that the shipments were mislabeled, and opened a package and confirmed the mislabeling, before the law enforcement officials conducted a search. There are no analogous facts here.

Because the Sunshine Wholesale shipments lacked indicia of dangerous or otherwise suspicious contents, the Court finds that FedEx's common law right of inspection was not triggered. Even if such a right existed, the Court does not believe such a right was delegable to the Government, until evidence of illegality or other violation of FedEx's interests was actually found by the carrier.

**2. Express Notice of Right to Inspect**

The Government also argues that FedEx had the authority to search, or to consent to a governmental search, according to bills of lading covering these shipments, and National Motor Freight Classification rules. The Government cites to *U.S. v. Young,* 350 F.3d 1302 (11th Cir. 2003). In *Young,* the bill of lading stated: "RIGHT TO INSPECT—We may, at our option, open and inspect your packages prior to or after you give them to us to deliver." *Id.* at 1307.

In contrast to *Young,* the bills of lading at issue here do not contain a notice provision sufficient to apprise Defendant that FedEx retained a right of inspection. The Government asserts that language on the front of the bills of lading and in section 7(c) on the reverse side of the bills, along with National Motor Freight Classification rules, provides notice to Defendant. The front of the bills reads:

> RECEIVED, subject to individually determined rates or contracts that have been agreed upon in writing between the carrier and the shipper, if applicable, otherwise to the rates, classifications, and rules that have been established by the carrier and are available to the shipper, on request, and to all applicable state and federal regulations, the property described below, in apparent good

order, except as noted (contents and condition of contents of package unknown) marked, consigned, and destined as shown hereon, which said carrier agrees to carry to destination, if on its route, or otherwise to deliver to another carrier on the route to destination. Every service to be performed hereunder shall be subject to all conditions not prohibited under law, whether printed or written, herein contained, including the conditions agreed on the back hereof, or otherwise referenced, which are hereby agreed to by shipper and accepted for himself and his assigns.

Section 7(c) reads:

Nothing in this bill of lading shall limit the right of the carrier to require the prepayment or guarantee of the charges at the time of shipment or prior to delivery. If the description of articles or other information on this bill of lading is found to be incorrect or incomplete, the freight charges must be paid based upon the articles shipped.

The National Motor Freight Classification, a set of rules governing certain common carriers, including FedEx, who ship commodities interstate, provides:

Inspection of Property: When carrier's agent believes it necessary that the contents of packages be inspected, he shall make or cause such inspection to be made, or require other sufficient evidence to determine the actual character of the property. When found to be incorrectly described, freight charges must be collected according to proper description.

National Motor Freight Classification Rule 100–A, Item 360, § 3.

This language is not included in the bills of lading applicable to the Sunshine Wholesale shipments. Nor do the bills explicitly reference the National Motor Freight Classification. The Government's position is that these rules apply under the general language contained on the front of the bills of lading, and that because these rules were available to the Defendant upon request, Defendant received notice of FedEx's right to inspect.

The Court is of the view that the paragraphs contained on the bills of lading and the National Motor Freight Classification rules do not provide notice of a right to inspect which is sufficient to justify the warrantless governmental searches that occurred in this case. Thus, the Court holds that the language contained on FedEx's bills of lading did not give FedEx authority beyond that it had at common law to consent to warrantless governmental searches.

#### 3. Apparent Authority

In its final brief, the Government argued that to the extent FedEx lacked the actual authority to consent to the search, the Customs Service believed the statements of FedEx that it had such authority, so the search was legitimate under the apparent authority doctrine. Because this argument was first raised in the Government's last brief, the Defendant did not have a reasonable opportunity to respond to the argument and the Court thus will not consider it.

### C. *Inevitable Discovery*

The Government further argues that it would have inevitably discovered the evidence contained within the packages it searched at FedEx because Vietti would have turned all the packages over to the Government upon receipt. The Government argues that the evidence is thus admissible, regardless of whether it was found in an otherwise unconstitutional warrantless search. Defendant contends that the Government cannot satisfy the requirements of the inevitable discovery doctrine because the Government never

sought to obtain a search warrant for the packages in issue.

In order for the inevitable discovery doctrine to allow the use of otherwise illegally obtained evidence, the Government must prove by a preponderance of the evidence that (1) there was a reasonable probability that the evidence would have been discovered by lawful means in the absence of the police misconduct and (2) the Government was actively pursuing a "substantial alternate line of investigation at the time of the constitutional violation." *U.S. v. Lamas,* 930 F.2d 1099, 1102 (5th Cir.1991); *U.S. v. Cherry,* 759 F.2d 1196, 1205–06 (5th Cir.1985). Inevitable discovery cannot rest upon speculation, but rather must be supported by historical facts that can be verified or impeached. *Lamas,* 930 F.2d at 1102.

The Government claims that because it obtained the contested evidence from the FedEx packages with Vietti's consent after the packages were delivered to him, because the Government had marked many of the shipped goods for identification prior to them being sold to Defendant, and because the Government had obtained from Vietti, before the 2003 shipments, authority to inspect packages sent to him by Sunshine Wholesale, it satisfied its burden of proving it was actively pursuing a substantial alternate line of investigation. The Government argues that the testimony of Agent Springer that he could have obtained the evidence after it was delivered to Vietti establishes that there was a reasonable probability that the evidence would have been discovered by lawful means, notwithstanding the unlawful search.

Relying on *Cherry* and *Lamas,* Defendant argues that the Government cannot establish that it was actively pursuing an alternate line of investigation because there is no evidence that the Government was pursuing obtaining a warrant when the searches occurred.

In *Cherry,* the Court of Appeals held that evidence seized as a result of a warrantless search was not admissible under the inevitable discovery doctrine even though there was sufficient probable cause to obtain a warrant because the police officer had not taken any steps to procure a warrant at the time of the search. *Cherry,* 759 F.2d at 1206. In contrast, in *Lamas,* the Court of Appeals held that evidence acquired as a result of a warrantless search was admissible under the inevitable discovery doctrine because there was probable cause and at the time the evidence was seized, a police officer had left the premises to obtain a warrant. 930 F.2d at 1103.

While *Cherry* and *Lamas* focus on the likelihood that the government could have obtained a warrant and the government's efforts toward procuring a warrant, neither decision states that the government must be actively seeking a warrant in order to satisfy the requirement that the government prove it had ongoing a substantial alternate line of investigation that would have produced the same material found in the warrantless search. *Cherry* and *Lamas* hold that whether the government made an effort to obtain a warrant is a factor that may be considered in establishing the existence of an alternate line of investigation, but that is certainly not the only means of proving it. The Court must determine whether, despite the Government's failure to seek a warrant, it satisfied its burden of establishing that it was pursuing a substantial alternate line of investigation when it conducted the searches at the FedEx facility, and, if so, whether the evidence establishes that there was a reasonably probability that the evidence would have been obtained through that alternate line of investigation.

According to Detective Howard Robl of Broward County, Florida, Vietti was cooperating with the Government in December 2002, which was before the first FedEx search on January 20, 2003. Vietti, Agent Springer, and Detective Robl all confirmed Vietti's cooperation, willingness to assist the Government, and agreement to hold any packages identified by the Government for pick up by a detective. Based on the evidence that Vietti was cooperating with the Government when the searches were conducted, and that he placed no restrictions on his consent to the Government to search what was sent to him by Sunshine Wholesale, and was willing to allow the Government to search and seize whatever packages sent by Sunshine Wholesale it wished to search and seize, the Court finds that the Government established by a preponderance of the evidence that there was a reasonable probability that the evidence would have been inevitably obtained through the alternate investigation of what Vietti received from Sunshine Wholesale.

### D. *Third Party and Implied Consent*

Even if the Government were unable to demonstrate inevitable discovery, the Government would nonetheless prevail because the Court finds that Vietti impliedly consented to the warrantless governmental searches at FedEx.

The Government argues that because Vietti was cooperating with the Government and consented to searches of property sent to him by Sunshine Wholesale, Vietti impliedly consented to the searches in Texas. As the addressee, he certainly had the right to do so. As his testimony confirmed, he had no reason to care whether a search and seizure occurred at his location in Florida or at the shipment facility in Texas. Because Agent Springer and Vietti confirmed that Vietti was not requested to give the Customs Service permission to inspect the packages while they were at the FedEx facility, Vietti's consent to such searches would have to be implied. In support of a finding of implied consent, the Government relies on *U.S. v. Williams,* 106 F.3d 1173 (4th Cir.1997) and *U.S. v. Kurck,* 552 F.2d 1320 (8th Cir. 1977).

In *U.S. v. Williams,* a defendant convicted of distributing methamphetamine appealed his conviction, in part on the grounds that envelopes containing methamphetamine were improperly admitted because they were the fruits of an unconstitutional warrantless search. 106 F.3d at 1177. The defendant had sent the envelopes to a post office box, which the defendant believed belonged to Angel, a purchaser of methamphetamine. *Id.* at 1175. In actuality, Angel was a government informant. Government agents retrieved the envelopes delivered to the post office box, without Angel's specific consent. *Id.* The Fourth Circuit noted that Angel had the right to consent to the searches because the envelopes were addressed to him, and found that he had impliedly consented to the searches in light of his conduct during the investigation. *Id.* at 1177. The Court of Appeals focused on the fact that Angel was cooperating with the government, and that he had agreed to purchase drugs from the defendant using government funds. *Id.* The court also focused on the fact that the post office box was under the exclusive custody and control of the government. *Id.* at 1177–78. In light of these facts, the court concluded, "[T]his evidence of the relationship between Angel and the Task Force agents establishes Angel's implied consent. Accordingly, the agent's search of the packages did not violate Williams' constitutional rights as a sender of the package." *Id.* at 1178.

In *U.S. v. Kurck,* a defendant appealed his conviction of conspiring to sell counterfeit money and possessing plates intended

to be used in counterfeiting, on the grounds that the government unlawfully searched the trunk of the automobile in which he was riding, without the informant-driver's express consent. 552 F.2d at 1320–21. Noting that the informant undertook to purchase counterfeit money using funds supplied by the government agents and that the informant used his own automobile to lead the agents to the defendant, the Eighth Circuit upheld the conviction, holding that consent by the informant could be implied in light of the cooperative relationship between the informant and the arresting officers. *Id.* at 1321.

The Court finds this case similar to *Williams* and *Kurck.* Agent Springer, Detective Robl, and Mr. Vietti testified that Vietti was cooperating with the Government before early 2003, and that Vietti had agreed to the Government's seizure of FedEx shipments sent to his companies by Sunshine Wholesale. Vietti confirmed he had placed no limits on the Government's search and seizure of those packages and that he would have consented to a search of them at the FedEx facility in Texas had anyone asked him to do so. This evidence indicates a cooperative relationship between Vietti and the Government that is comparable to that present in *Williams* and *Kurck.* The Court finds that in light of such facts, his consent may be implied as to the searches at FedEx of the packages sent by Sunshine Wholesale to Vietti in early 2003.

## CONCLUSION

For the foregoing reasons, the Court finds that Defendant's Motion to Suppress should be DENIED.

**SO ORDERED.**